**Dorothy A. YETTER, Administratrix ad prosequendum and general administratrix of the goods and chattels, rights and credits of Howard E. Yetter, Deceased,**

v.

**Cathryn H. RAJESKI, et al.**

**Civ. A. No. 193–67.**

United States District Court
D. New Jersey.
May 11, 1973.

106 

Edward S. Miller, Gant & Miller, Millville, N. J., for plaintiff Yetter.

John Friedrich, East Greenville, Pa., Richard I. Wood, Lewis, Siegel & Wood, Trenton, N. J., for defendant Rajeski.

John Dolan, Crummy, O'Neill, Del Deo & Dolan, Newark, N. J., Herzfeld & Rubin, P. C., New York City, for defendants.

## OPINION

BARLOW, District Judge.

This is a wrongful death action brought pursuant to the provisions of N.J.S.A. 2A:31–1, et seq., in which the plaintiff seeks a money judgment against the defendants for fatal injuries suffered by the plaintiff's decedent in an automobile accident. The plaintiff, Dorothy A. Yetter, is the administratrix ad prosequendum for Howard E. Yetter, her deceased husband. The defendant Volkswagenwerk Aktiengesellschaft is the manufacturer of the Volkswagen automobile, and the defendant Volkswagen of America, Inc., is the importer of those vehicles. The defendants Cathryn H. Rajeski and William J. Rajeski are the operator and owner, respectively, of the other vehicle involved in the accident. Jurisdiction is conferred by reason of diversity of citizenship, 28 U.S.C.A. § 1332.

The accident giving rise to this cause of action occurred on November 9th, 1966, on Route 130 in Mercer County, New Jersey. The north and south bound lanes of this road are separated by a grass median strip. There are, however, paved intervals in this median strip which permit motorists to execute U-turns in order to reverse their direction. Moments prior to the accident here, Cathryn H. Rajeski made such a U-turn, driving her husband's 1964 Chrysler Imperial into the righthand southbound lane. Mr. Yetter's 1965 Volkswagen "Beetle" sedan immediately thereafter crashed into the rear of the Rajeski vehicle, and the resulting impact caused his chest to collide with the vehicle's steering assembly.

Mr. Yetter was taken to St. Francis Hospital in Trenton, where, following treatment, his condition appeared to have stabilized; however, on November 12th, 1966, his condition suddenly worsened, and he died. An autopsy revealed that Mr. Yetter had thirteen fractured ribs and disclosed other conditions secondary thereto, including a hemothorax, which caused his death. None of Mr. Yetter's vital organs, including his heart and lungs, however, had been damaged.

Following the institution of this suit, the plaintiff's claim against the Rajeskis was settled for $76,500.00.

This case, as to the remaining defendants, was tried before a jury. At the conclusion of the plaintiff's case, the defendants—in effect—renewed an earlier motion they had made for summary judgment, Fed.R.Civ.P. 56, and moved, further, for a directed verdict, Fed.R. Civ.P. 50. The following represents my resolution of those motions.

The plaintiff's thesis here rests on what has come to be known as the "crashworthiness" doctrine, or the "second accident" theory, premised essentially on the holding in Larsen v. General Motors, 391 F.2d 495 (8th Cir. 1968). The *Larsen* court held that the car manufacturer's duty under general negligence principles to design a product which is safe for "normal" use extends to the situation where the vehicle is involved in a collision. Thus, even though no defect in manufacture or design causes the initial accident, the manufacturer can be held liable for "enhanced" injuries—those which would not have occurred absent an "unreasonably dangerous" design. The question of whether a particular design is "unreasonably dangerous" is, said the court, a question for the jury. The defendants deny that the *Larsen* case is controlling in New Jersey and insist that Evans v. General Motors, 359 F.2d 822 (7th Cir. 1966), represents New Jersey law.

*Evans* also arose out of an automobile collision in which the plaintiff sued the defendant in negligence, breach of implied warranty, and strict tort liability, seeking to recover money damages for enhanced injuries resulting from a design defect. *Evans* held that "the intended purpose of an automobile does not include its participating in collisions with other objects" even though such collisions were foreseeable, and affirmed the District Court's dismissal of the plaintiff's case.

In Biasvachi v. Frost, L–37, 763–67 (N.J.Super., Bergen County, June 5th, 1970); Mickendrow v. United States Homes and Development Corp., L–35, 295–67 (N.J.Super., Ocean County, May 21st, 1970), and Burnet v. General Motors Corp., Civil No. 833–66, D.N.J., June 3rd, 1969), two New Jersey trial court judges and one Federal District Court judge rejected *Larsen*. However, the Supreme Court of New Jersey has not had occasion to deal with a *Larsen*-type claim. Accordingly, we must determine what result the Supreme Court of New Jersey would have reached, given the circumstances of this case. Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); Commissioner v. Estate of Bosch, 387 U.S. 456, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1966); Roginsky v. Richardson-Merrell, Inc., 378 F.2d 832 (2nd Cir. 1967).

The sole element relied on by the plaintiff to impose a duty upon the manufacturer in this genre of cases is the

foreseeability of automobile accidents. The mere fact that defendants here could logically foresee that some Volkswagens would be involved in accidents suffices, it is alleged, to require them to make those vehicles "reasonably safe" in a collision or be made to respond in damages. It is obvious, of course, that automobiles are unhappily and almost continuously colliding with other motor vehicles, with trees, with culverts, with locomotives, and with every imaginable type of object, either moving or fixed; that they are, indeed, driven off bridges, driven into water, and driven over cliffs; they are, in fact, involved in collisions of limitless variety. But does this foreseeability, in negligence terms, create a duty on the part of automobile manufacturers to design their cars to avoid the various injuries and damages which result from such accidents? The question of imposing such a duty is, of course, not a question of fact but a question of law for the court to determine. Goldberg v. Housing Auth. of Newark, 38 N.J. 578, 186 A.2d 291 (1962); Evans v. General Motors, supra; Larsen v. General Motors, supra.

■ In New Jersey, the test for establishing the existence of a duty is set forth in Goldberg v. Housing Auth. of Newark, supra, at p. 583, 186 A.2d at p. 293, as follows:

"The question is not simply whether a criminal event is foreseeable, but whether a duty exists to take measures to guard against it. Whether a duty exists is ultimately a question of fairness. The inquiry involves a weighing of the relationship of the parties, the nature of the risk, and the public interest in the proposed solution." 38 N.J., at 583, 186 A.2d, at 293.

In the State of New Jersey, then, the scope of duty is not coextensive with foreseeability. Other considerations are involved.

■ Plaintiff insists that the duty required of the defendants here was to design, manufacture and install in its 1965 Volkswagens a collapsible or non-rigid steering assembly which would have been capable of absorbing sufficient impact energy to have avoided the injuries to Mr. Yetter's chest which caused his death. This is so even though the plaintiff's witnesses conceded that in 1965 all automobiles sold commercially were equipped with rigid steering assemblies.

Given the limitless variety and conditions under which automobile collisions occur in terms of, for example, impact speed, direction of impact, multiple impacts, type of impact, and location of impact, we think it unfair to the defendants to impose upon them such a retrospective duty. Any part of an automobile which causes injury to an occupant upon impact with that part can be said —after the fact—to have been capable of "safer" design. Without legislatively-imposed objective standards defining the design responsibility of automobile manufacturers, we think the imposition of the duty sought here by the plaintiff to be unfair in light of the meaning of *Goldberg*.

Accordingly, I am satisfied that the New Jersey Supreme Court would here have adopted the holding of Evans v. General Motors, supra, and rejected Larsen v. General Motors, supra, by finding that—given the circumstances here— even though automobile collisions are readily foreseeable, no lawful duty running to the plaintiff-decedent was imposed upon the defendants.

In short, I am persuaded that the plaintiff's contentions of negligence are not viable in New Jersey and that, therefore, no jury question was presented.

■ The plaintiff also contends here that the defendants are liable to the plaintiff for breach of warranty or strict liability in tort.

The plaintiff has presented no case, or line of cases, supporting either of these theories of recovery either in the State

of New Jersey or elsewhere. Indeed, the court in *Larsen*, upon which the plaintiff relies so extensively, held:

"On the issue of strict liability or implied warranty of merchantability for intended use, we make no comment as our holding of sufficiency of counts one and two are dispositive. The doctrine of strict liability is one of policy for the various states and the National Congress, and we do not think there has been a sufficient showing on the Michigan law as respects this point, particularly in the automotive field. . . ." Larsen v. General Motors, 391 F.2d 495, at p. 506.

Moreover, New Jersey case law seems to suggest that liability will only be imposed on such grounds where the original accident is caused by the defective design. In Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 409–410, 161 A.2d 69, 98 (1960), the court stated:

" . . . Obviously there is nothing in the proof to indicate in the slightest that the most unusual action of the steering wheel was caused by Mrs. Henningsen's operation of the automobile on this day, or by the use of the car between delivery and the happening of the incident. Nor is there anything to suggest that any external force or condition unrelated to the manufacturing or servicing of the car operated as an inducing or even concurring factor."

Again we must reject these additional theories of liability. Accordingly, we find that New Jersey would not impose liability on these grounds under the circumstances of this case.

Finally, as to the defendants' motion for a directed verdict, it is well settled in New Jersey that upon motions for an involuntary dismissal, which is the equivalent of a motion for a directed verdict, the plaintiff's testimony and all inferences derived therefrom are taken in the light most favorable to the plaintiff. Applying that standard here, we are satisfied that the proofs presented by the plaintiff were insufficient. The plaintiff's expert witnesses were not physicians but were engineers. In substance, they testified that in 1965 the state of the engineering art would have permitted the design and installation of a non-rigid steering assemblage capable of reducing the impact forces to Mr. Yetter's chest. Assuming that such a device was capable of design and installation and capable of absorbing energy to the extent testified to by the plaintiff's witnesses, there was still no medical testimony, in terms of the human body's impact tolerance. That is, there was no testimony from a medical standpoint that, given the installation of the plaintiff's hypothetical steering wheel design, Mr. Yetter's chest would have been able to withstand the injuries actually sustained, or that the injuries would have been substantially reduced. Here, particulary when we are dealing with a claim for enhanced injuries, it is absolutely necessary that the jury be presented with some evidence as to the extent of injuries, if any, which would have been suffered by Mr. Yetter had the plaintiff's hypothetical design been installed in the Volkswagen. The jury, without such testimony, is left only to speculate as to the injuries Mr. Yetter would have suffered if the energy-absorbing steering column had, in fact, been installed, and this could only have been established by competent medical testimony as to the forces which the human body could withstand without injury, or without injury to the extent suffered by Mr. Yetter.

An appropriate order will be submitted.