Terri Lee **DREISONSTOK**, an infant, by her mother and next friend, Catherine A. Dreisonstok, and Catherine A. Dreisonstok, Appellees,

v.

**VOLKSWAGENWERK, A. G.,** a/k/a Volkswagenwerk Aktiegesellschaft, a foreign corporation, and Volkswagen of America, Inc., a New York corporation, Appellants.

No. 73–1074.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 3, 1973.

Decided Jan. 14, 1974.

Alexander H. Slaughter, Richmond, Va. (Rosewell Page, II, McGuire Woods, & Battle, Richmond, Va., Herbert Rubin, Michael Hoenig and Herzfeld & Rubin, P. C., New York City, on brief) for appellants.

Oren R. Lewis, Jr., Arlington, Va. (Gary R. Sheehan and Tolbert, Lewis & Fitzgerald, Ltd., Arlington, Va., on brief) for appellees.

Before HAYNSWORTH, Chief Judge, BOREMAN, Senior Circuit Judge, and RUSSELL, Circuit Judge.

DONALD RUSSELL, Circuit Judge:

The plaintiff, along with her mother, sues a car manufacturer for so-called "enhanced" injuries sustained by her when the Volkswagen microbus in which she was riding crashed into a telephone pole. The microbus had passed the crest of a small hill and was proceeding down the grade at the time of the accident. When the vehicle passed the crest of the hill, the driver noted that his speed was about 40 miles an hour. As the vehicle continued down the hill, the bus began "picking up some speed, a little too much." To reduce his speed, the driver attempted to downshift the vehicle.[1] Because he had some difficulty in locating the gearshift lever, the driver took his "eyes off the road" and in some way "pulled the steering wheel" causing the vehicle to veer "to the right" into "the driveway". The plaintiff screamed, causing the driver to look up. As the driver did, he "saw a telephone pole headed right toward us". He tried to cut back into the road but there "was an oncoming vehicle the other way, so it was either the telephone pole or another vehicle." He chose the telephone pole. The bus hit the pole on its right front. The plaintiff was seated in the center of the seat, next to the driver, with her left leg under her. As a result of the impact, her right leg was caught between the back of the seat and the dashboard of the van and she was apparently thrown forward. She sustained severe injuries to her ankle and femur. She seeks to recover for her injuries, and her mother for medical expenses, from the vehicle manufacturer, contending that the latter was guilty of negligent design in the location of the gearshift in its vehicle and in the want of crashworthiness of its vehicle. The action was tried without a jury. The District Court dismissed the claim relating to the gearshift but concluded that the defendant manufacturer had been guilty of negligence[2] in failing to use due care in the design of its vehicle by providing "sufficient energy-absorbing materials

---

1. As the driver, in his testimony, explained it, "[F]or the simple reason I was picking up too much speed and I was coming down a hill, and my father had always taught me to downshift whenever I had the chance to, to save on the brakes."

2. As in Larsen v. General Motors Corporation (8th Cir. 1968) 391 F.2d 495, 506, the Court based its decision on ordinary negligence principles rather than warranty or strict liability. It has been intimated that this is the correct basis in design cases. See Brown v. General Motors Corporation (4th Cir. 1966) 355 F.2d 814, 821, cert. denied 386 U.S. 1036, 87 S.Ct. 1474, 18 L.Ed. 2d 600; Gray v. General Motors Corporation (8th Cir. 1970) 434 F.2d 110, 114; Note, 1966 Utah L.Rev. 698, 705. It would appear, however, that it makes little or no real difference whether liability is asserted on grounds of negligence, warranty or strict liability; the applicable principles are roughly the same in any case. Chestnut v. Ford Motor Company (4th Cir. 1971) 445 F.2d 967, 968–969; Note, 24 Vanderbilt L.Rev. 862, 863.

or devices or 'crush space,' if you will, so that at 40 miles an hour the integrity of the passenger compartment would not be violated", and that, as a result, the injuries of the plaintiff were enhanced "over and above those injuries which the plaintiff might have incurred." From judgment entered on the basis of that conclusion in favor of the plaintiff and her mother, the defendants have appealed. We reverse.

■■ The correctness of the finding by the District Court that the defendant manufacturer was guilty of negligent design in this case depends on the determination of what extent a car manufacturer owes the duty to design and market a "crashworthy" vehicle, one which, in the event of a collision, resulting accidentally or negligently from the act of another and not from any defect or malfunction in the vehicle itself, protects against unreasonable risk of injury to the occupants.[3] The existence and nature of such a duty is a legal issue, for resolution as a matter of law. So much all the authorities agree.[4] There are, however, two fairly definite lines of conflicting authority on whether there is

such a duty.[5] One group of which *Evans*,[6] is the leading authority, holds that no such duty rests on the manufacturer, since the "intended use" of an automobile does not extend to collisions. The other, while relieving the manufacturer of any duty to design an accident-proof vehicle, would impose a duty to use reasonable care in the design and manufacture of its product so as "to eliminate any unreasonable risk of foreseeable injury" as a result of a collision, for which the manufacturer may not be responsible. *Larsen* is the primary authority for this rule.[7]

■ This is a diversity case and, as such, the rights of the parties are governed by Virginia law.[8] It is conceded that there is no binding Virginia precedent on a car manufacturer's duty to design a "crashworthy" vehicle. The plaintiffs argue, though, that the general trend of the decisions in Virginia, as evidenced by the opinion of this Court in Spruill v. Boyle-Midway, Incorporated (4th Cir. 1962) 308 F.2d 79, ranges Virginia with those jurisdictions imposing liability for negligent design in failing to take reasonable precautions against

---

3. "The term 'crashworthiness'", as defined in the Motor Vehicle Information and Cost Savings Act, "means the protection that a passenger motor vehicle affords its passengers against personal injury or death as a result of a motor vehicle accident." Section 1901(14), 15 U.S.C.

Crashworthiness has, also, been defined as "the relative ability of an automobile to protect its passengers from the second collision." Note, Liability for Negligent Automobile Design, 52 Iowa L.Rev. 953, 957 (1967).

Another definition of crashworthiness is phrased as the "second collision doctrine" which "seeks to impose common law liability upon the automobile industry for injurious consequences of automobile collisions despite the fact that no defect or malfunction in the vehicle causes the mishap." Hoenig & Werber, Automobile "Crashworthiness": An Untenable Doctrine, 1971 Ins.L.Journal 583.

The term "second collision" in these definitions refers to the collision "of the passenger with the interior part of the automobile" after the initial impact or collision, in this case, the collision of the van with the telephone pole. Larsen, p. 502 (391 F.2d); Note, 80 Harv.L.Rev. 688. And, "[C]ourts

have described enhanced injuries as 'second accident' injuries—those injuries that occur after the initial accident." Note, Torts—Strict Liability—Automobile Manufacturer Liable for Defective Design that Enhanced Injury After Initial Accident, 24 Vand.L.Rev. 862, 864 (1971).

4. Larsen v. General Motors Corporation, *supra* (391 F.2d p. 498); Evans v. General Motors Corporation, (7th Cir. 1966) 359 F. 2d 822, 824, cert. denied 385 U.S. 836, 87 S. Ct. 83, 17 L.Ed.2d 70.

5. *Compare*, Evans v. General Motors Corporation, *supra*, with Larsen v. General Motors Corporation, *supra*, and Alexander v. Seaboard Air Line Railroad Company (D.C.N. C.1971) 346 F.Supp. 320, 322, with Grundmanis v. British Motor Corporation (D.C. Wis.1970) 308 F.Supp. 303, 306.

The conflicting authorities are set forth in the Annotation, 42 A.L.R.3d 560.

6. 359 F.2d 822.

7. 391 F.2d at 503.

8. Landrum v. Massey-Ferguson, Inc. (5th Cir. 1973) 473 F.2d 543, 544.

unreasonable risks of harm to passengers by reason of a collision. For purposes of this decision, it may be assumed that this is the trend of the Virginia decisions. Assuming it to be applicable to the facts of this case, however, the *Larsen* rule will not support recovery by the plaintiffs.

■ In arguing in favor of liability, the appellees stress the foreseeability in this mechanical age of automobile collisions, as affirmed in numerous authorities, and would seemingly deduce from this a duty on the car manufacturer to design its vehicle so as to guard against injury from involvement of its vehicle in any such anticipated collisions. The mere fact, however, that automobile collisions are frequent enough to be foreseeable is not sufficient in and of itself to create a duty on the part of the manufacturer to design its car to withstand such collisions *under any circumstances*. Foreseeability, it has been many times repeated, is not to be equated with duty;[9] it is, after all, but one factor, albeit an important one, to be weighed in determining the issue of duty.[10] Were foreseeability of collision the absolute litmus test for establishing a duty on the part of the car manufacturer, the obligation of the manufacturer to design a crash-proof car would be absolute, a result that *Larsen* itself specifically repudiates.[11] After all, "[N]early every accident situation, [involving an automobile] no matter how bizarre, is 'foreseeable' if only because in the last fifty years drivers have discovered just about every conceivable way of wrecking an automobile."[12]

9. The point is well expressed in Goldberg v. Housing Authority (1962) 38 N.J. 578, 186 A.2d 291, 293:

"The question is not simply whether a criminal event is foreseeable, but whether a duty exists to take measures to guard against it. Whether a duty exists is ultimately a question of fairness. The inquiry involves a weighing of the relationship of the parties, the nature of the risk, and the public interest in the proposed solution."

*See, also,* § 289, comment b, 2d Restatement of Torts:

" * * * In order that an act may be negligent it is necessary that the actor should realize that it involves a risk of causing harm to some interest of another, such as the interest in bodily security, which is protected against unintended invasion. But this of itself is not sufficient to make the act negligent. Not only must the act involve a risk which the actor realizes or should realize, but the risk which is realized or should be realized must be unreasonable, as to which see §§ 291–293."

The editor in 42 Notre Dame L.Rev. 111, 115 (1967) puts it:

"Foreseeability alone, however, creates no duty. If such were the case, a manufacturer of hammers, foreseeing injured fingers and thumbs, would be liable for every such injury. Thus, duty is established as a matter of social policy—as a means to an end."

*See, also,* Passwaters v. General Motors Corporation (8th Cir. 1972) 454 F.2d 1270, 1275, n. 5.

"Foreseeability" does provide the formula for determining "intended use". Gardner v. Q.H.S., Inc. (4th Cir. 1971) 448 F.2d 238, 242.

10. *See,* Green, Foreseeability in Negligence Law, 61 Col.L.Rev. 1401, 1418 (1961):

"There are many factors other than foreseeability that may condition a judge's imposing or not imposing a duty in the particular case."

*See, also,* Note, Foreseeability in Product Design and Duty to Warn Cases—Distinctions and Misconceptions, 1968 Wis.L.Rev. 228, 244:

" * * * anticipation of harm, of course, is by no means the only factor involved. Other aspects of social policy find crystallization in other doctrinal developments."

*See,* Note, 42 Notre Dame L.Rev. 111, 114, quoting from 2 Harper & James, Torts, sec. 28.6:

"Obviously the maker of goods is bound to foresee and guard against only unreasonable risks which result from some use of his product which a reasonable manufacturer would anticipate as likely enough to be taken into account."

11. *Larsen* states the rule to be that "an automobile manufacturer is under no duty to design an accident-proof or fool-proof vehicle * * *, but such manufacturer is under a duty to use reasonable care in the design of its vehicle to avoid subjecting the user to an unreasonable risk of injury in the event of a collision." (Page 502, 391 F.2d).

12. Hoenig & Werber, Automobile "Crashworthiness": An Untenable Doctrine, *supra* (1971 Wis.L.Journal at 595).

The key phrase in the statement of the *Larsen* rule is *"unreasonable risk* of injury in the event of a collision", not foreseeability of collision.[13] The latter circumstance is assumed in collision cases under the *Larsen* principle; it is the element of "unreasonable risk" that is uncertain in such cases and on which the determination of liability or no liability will rest.[14] It would patently be unreasonable "to require the manufacturer to provide for every conceivable use or unuse of a car." Nader & Page, Automobile Design and the Judicial Process, 55 Cal.L.Rev. 645, 646. Liability for negligent design thus "is imposed only when an unreasonable danger is created. Whether or not this has occurred should be determined by general negligence principles, which involve a balancing of the likelihood of harm, and the gravity of harm if it happens against the burden of the precautions which would be effective to avoid the harm."[15] In short, against the likelihood and gravity of harm "must be balanced in every case the utility of the type of conduct in question."[16] The likelihood of harm is tied in with the obviousness of the danger, whether latent or patent, since it is frequently stated "that a design is not unreasonably dangerous because the risk is one which any one immediately would recognize and avoid."[17] The purposes and intended use of the article is an even more impor-

See, Yetter v. Rajeski (D.C.N.J.1973) 364 F.Supp. 105, 108:

"* * * It is obvious, of course, that automobiles are unhappily and almost continuously colliding with other motor vehicles, with trees, with culverts, with locomotives, and with every imaginable type of object, either moving or fixed; that they are, indeed, driven off bridges, driven into water, and driven over cliffs; they are, in fact, involved in collisions of limitless variety."

13. This is made clear by the same Court that decided *Larsen* in the subsequent decision of Schneider v. Chrysler Motors Corporation (8th Cir. 1968) 401 F.2d 549, 558. In that case, the Court said that the duty there found rested on the obligation to avoid the "creation of an unreasonable risk of harm", and, restated the rule of *Larsen*, that the users of the vehicle were only subjected "to *an unreasonable risk of harm* when the automobiles *were being used for the purpose intended*" (Italics Court's) (at p. 556).

See, Note, Foreseeability in Product Design and Duty to Warn Cases—Distinctions and Misconceptions, 1968, Wis.L.Rev. 228, 229:

"The apparent emphasis on foreseeability (in automobile cases) is misleading because it blurs the more important policy bases of decision."

Again, at p. 245:

"In fact, however, the term 'foreseeability' has become a lop-sided doctrinal vehicle which leads the reader, trying to follow its course, to believe that the prudent manufacturer ought to anticipate the carelessness and ignorance of the public; that he is liable because he is in some way more at fault. The term has been ex-

panded to such an extent as to become no more than a grotesque of its denotative meaning."

14. See, Prosser on Torts (3rd Ed. 1964), p. 149:

"In the light of the recognizable risk, the conduct, to be negligent, must be unreasonable."

15. *Larsen*, p. 502, n. 3, quoting from Noel, Manufacturer's Negligence of Design or Directions for Use of A Product, 71 Yale L.J. 816, 818 (1962).

16. Prosser on Torts (3rd Ed., 1964) p. 151; Note, Liability for Negligent Automobile Design, 52 Iowa L.Rev. 953, 959.

The determination of whether conduct is negligent or not always involves the weighing of interests, the balancing of "the magnitude of the risk" against "the value which the law attaches to the conduct which involves it." See, Section 283, comment e, 2d Restatement Torts; Tobin v. Grossman (1969) 24 N.Y.2d 609, 301 N.Y.S.2d 554, 249 N.E.2d 419, 422–423.

17. *Ibid*, 71 Yale L.J. at p. 836.

*Larsen* itself underscores this point, stating (p. 501):

"Accepting, therefore the principle that a manufacturer's duty of· design and construction extends to producing a product that is reasonably fit for its intended use and *free of hidden defects that could render it unsafe for such use*, the issue narrows on the proper interpretation of 'intended use'." (Italics added.)

*Cf.*, Schemel v. General Motors Corporation (7th Cir. 1967) 384 F.2d 802, 805, cert. denied 390 U.S. 945, 88 S.Ct. 1030, 19 L.Ed. 2d 1134 which follows *Evans*, but on this

tant factor to be considered. After all, it is a commonplace that utility of design and attractiveness of the style of the car are elements which car manufacturers seek after and by which buyers are influenced in their selections.[18] In every case, the utility and purpose of the particular type of vehicle will govern in varying degree the standards of safety to be observed in its design. This was recognized in the Traffic and Motor Vehicle Safety Act, which undertakes "to establish motor vehicle safety standards for motor vehicles." 15 U.S.C. 1381 et seq. In prescribing such standards, the Secretary is directed to "consider whether any such proposed standard is *reasonable, practicable and appropriate for the particular type of motor vehicle* * * *."* Section 1392(f)(3). (Italics added.) Stated somewhat differently, the safety of every type of vehicle is to be evaluated under this Act in connection with what is "reasonable, practicable and appropriate" for its special type. And this is the same rule that has been judicially applied, even in *Larsen* type cases.[19] Thus, in Dyson v. General Motors Corporation (D.C.Pa. 1969) 298 F.Supp. 1064, 1073, a case which followed and applied the *Larsen* rule, the Court emphasized that design safety must take account of "differentiation between various models of automobile" and involves "a recognition of the inherent characteristics of each." It pointed out that a convertible could not be made "as safe in roll-over accidents as a standard four-door sedan with center posts and full-door frames." The convertible was only required to be as reasonably safe as its intended use would allow and "not appreciably less safe than other convertibles." Price is, also, a

---

point may perhaps not be different from Larsen:

"The manufacturer is not an *insurer*. His duty is to avoid hidden defects and latent or concealed dangers [citing cases]. He is not bound to anticipate and guard against grossly careless misuse of his product by reckless drivers. The dangers attendant on excessive and unlawful speed are neither latent nor concealed."

*See, also*, Re Bruns Volkswagen Garage, Inc. (1968 Wis. C.C.) CCH Products Liability Reporter, § 5930, where, in absolving manufacturer of liability arising out of a collision, by reason of a claim of want of crashworthiness, it was held that "so long as the buyer was aware or made aware of the danger, * * * no warning was required * * *, because it must have been perfectly clear to the purchaser when he bought a Volkswagen that a head-on collision in such a small car would be very hazardous." 42 A.L.R.3d at p. 586.

Where the dangerous element in an article is latent, the usual basis for liability rests on failure to warn. This was the real rationale for the decisions in Spruill v. Boyle-Midway, Incorporated, *supra*, and Gardner v. Q.H.S., Inc., *supra*.

*Cf.*, Willis v. Chrysler Corporation (D.C. Tex.1967) 264 F.Supp. 1010, 1012, which, though adopting the *Evans* rule, used language which it would seem would be equally applicable to a decision following *Larsen*; i. e., that a car manufacturer is under no duty in the ordinary case "to design an automobile that could withstand a high speed collision and maintain its structural integrity."

18. Of course, safety may not be sacrificed unreasonably and any vehicle should be made as safe as it reasonably can, considering its special purpose and "intended use"; but standards of safety themselves must take into account the utility of the vehicle.

19. In Bratton v. Chrysler Motors Corp., an unreported decision from the Western District of Texas, 1972, the instructions of the District Court, as set forth in 4 St. Mary's L.J. 303, at p. 312, defines "unreasonable risk" in the design as one which is "dangerous to an extent beyond that which would be contemplated by an ordinary consumer who purchases the vehicle with the ordinary knowledge common to the community as to the characteristics of a product of the type purchased."

*Cf.*, however, Note, 80 Harv.L.Rev. 688, 691, where, in indicating why Courts may in design cases be influenced to deny liability, the editor states that, "it may be that while the consumer is unable to discover product defects by inspection, he is in a position to choose among different designs. But perhaps even in instances where information as to product design is available, this argument may attribute to most consumers a higher degree of awareness and sophistication than is realistic. Further, in view of the resulting injuries which could have been avoided, a court may not wish to leave completely open the alternative of sacrificing safety to other considerations, to whatever extent consumers consciously make such a choice."

factor to be considered, for, if a change in design would appreciably add to cost, add little to safety, and take an article out of the price range of the market to which it was intended to appeal, it may be "unreasonable" as well as "impractical" for the Courts to require the manufacturer to adopt such change.[20] Of course, if an article can be made safer and the hazard of harm may be mitigated "by an alternate design or device at no substantial increase in price", then the manufacturer has a duty to adopt such a design [21] but a Cadillac may be expected to include more in the way of both conveniences and "crashworthiness" than the economy car. Moreover, in a "crashworthy" case, it is necessary to consider the circumstances of the accident itself.[22] As *Dyson* puts it, "it could not reasonably be argued that a car manufacturer should be held liable because its vehicle collapsed when involved in a head-on collision with a large truck, at high speed." [23] In summary, every case such as this involves a delicate balancing of many factors in order to determine whether the manufacturer has used ordinary care in designing a car, which, giving consideration to the market purposes and utility of the vehicle, did not involve unreasonable risk of injury to occupants within the range of its "intended use".

■ Applying the foregoing principles to the facts of this particular case, it is clear that there was no violation by the defendant of its duty of ordinary care in the design of its vehicle. The defendant's vehicle, described as "a van type multipurpose vehicle",[24] was of a special type and particular design. This design was uniquely developed in order to provide the owner with the maximum amount of either cargo or passenger

---

20. *See,* Enders v. Volkswagenwerk, A.G., CCH Prod.Liab.Rep., § 5930 (Wis.Cir.Ct., 1968), quoted in Hoenig & Werber, *supra,* at p. 538:

> "When a G.M.C. tractor and a Mack tractor in head-on collisions do not furnish enough protection to prevent deaths of the respective drivers * * * to impose the duty of preparing inexpensive cars against head-on collisions seems beyond the realm of sensible public policy * * *."

In the Note, 52 Iowa L.Rev. 953, 972, it is stated that a basis for a claim of liability on account of defective design involves consideration of whether the manufacturer "could obviate or mitigate the injury by an alternate known design or device *at no substantial increase in price.*" (Italics added).

21. *Ibid.,* 52 Iowa L.Rev. 972.

*See, also,* Hoppe v. Midwest Conveyor Company, Inc. (8th Cir. 1973) 485 F.2d 1196, 1202:

> "Liability alleged from defective design encompasses many factors not generally relevant to ordinary negligence in tort cases. The comparative design with similar and competitive machinery in the field, alternative designs and post accident modification of the machine, the frequency or infrequency of use of the same product with or without mishap, and the relative cost and feasibility in adopting other design are all relevant to proof of defective design. * * *"

22. *See* Mieher v. Brown (Ill.1973) 301 N.E. 2d 307, 310 (reversing 3 Ill.App.3d 802, 278 N.E.2d 869):

> "Although the injury complained of may have been, in a sense, foreseeable, we do not consider that the alleged defective design created an unreasonable danger or an unreasonable risk of injury. In the words of section 435(2) of the Restatement (Second) of Torts, 'looking back from the harm to the actor's negligent conduct, it appears to the court highly extraordinary that it should have brought about the harm' for which recovery is now sought. Public policy and the social requirements do not require that a duty be placed upon the manufacturer of this truck to design his vehicle so as to prevent injuries from the extraordinary occurrences of this case."

23. 298 F.Supp. at 1073.

The circumstances of the collision must be considered in any determination whether the event was such as it was proper and reasonable—or even feasible—for it to guard against. *See* Kahn v. Chrysler Corporation (D.C.Tex.1963) 221 F.Supp. 677, 679; Hentschel v. Baby Bathinette Corp. (2d Cir. 1954) 215 F.2d 102, 105, cert. denied 349 U.S. 923, 75 S.Ct. 663, 99 L.Ed. 1254 and Alexander v. Seaboard Air Line Railroad Company, *supra* (346 F.Supp. at 327).

24. App. at 519.

space in a vehicle inexpensively priced and of such dimensions as to make possible easy maneuverability.[25] To achieve this, it advanced the driver's seat forward, bringing such seat in close proximity to the front of the vehicle, thereby adding to the cargo or passenger space. This, of course, reduced considerably the space between the exact front of the vehicle and the driver's compartment. All of this was readily discernible to any one using the vehicle; in fact, it was, as we have said, the unique feature of the vehicle. The usefulness of the design is vouchsafed by the popularity of the type.[26] It was of special utility as a van for the transportation of light cargo, as a family camper, as a station wagon and for use by passenger groups too large for the average passenger car. It was a design that had been adopted by other manufacturers, including American. It was a design duplicated in the construction of the large trucking tractors, where there was the same purpose of extending the cargo space without unduly lengthening the tractor-trailer coupling. There was no evidence in the record that there was any practical way of improving the "crashability" of the vehicle that would have been consistent with the peculiar purposes of its design. The only theory on which the plaintiffs posited their claim of negligent design was, to quote the language of their brief in this Court, that "[T]he 1968 Volkswagen station wagon did not provide the protection for the front seat passengers as did the 'normal' or standard passenger car." The "normal or standard passenger car", to which, under the plaintiffs' argument, the vehicle was required to conform if it was to meet the test of reasonable design, was defined by the plaintiffs on one occasion as "a standard American made vehicle, which is a configuration with the passengers in the middle and the motor in the front" [27] and on another as "a passenger car with an engine in front and with a long hood * * *." [28] And all of their expert testimony was to this point. These experts offered by the plaintiffs concededly made no attempt to compare for safety of design or for any other purpose defendant's special type of vehicle with similar types made by other manufacturers or indicated any way in which safety in such vehicles could have been improved, given the peculiar purpose of the vehicle. They completely disregarded the rule developed in *Dyson, supra,* and the standards developed by Congress in the Traffic and Motor Vehicle Safety Act, which would compare vehicles of the same type in determining safety standards. These experts contented themselves with arriving at the reasonable design of the defendant's vehicle by one test and that was by comparing it with the 1966 midsized Ford passenger car.[29] In short, the plaintiffs' theory of negligent design and the thrust of all their expert testimony on such point was that, to meet the test of ordinary care in design so as to avoid

---

25. In describing the character of this van, a witness for the defendant testified:

"It was designed to transport passengers and goods in a higher amount than the normal sedan on the same space which this vehicle would need in normal traffic." (app. at 521).

26. The popularity of the model was strikingly illustrated by the fact that the father of the driver of the microbus involved in this accident immediately purchased a new one to replace the one damaged in this accident. This is extremely persuasive evidence that the purchaser of the van did not regard it, in its design and manufacture, to involve any

"unreasonable risk" of harm as a result of its unique design to occupants.

27. App. at 171.

28. App. at 509.

29. In the direct examination of one of plaintiffs' expert witnesses, this point was made perfectly clear:

"Q. So that you are making your comparison between a 1966 Ford and a 1968 Volkswagen Type 2?

"A. That is correct." (App. at 207).

The other expert witnesses of the plaintiffs did likewise.

"unreasonable risk" of injury, the vehicle of the defendant had to conform with the configuration of the standard American passenger car, vintage 1966, *i. e.*, its motor must be in front, not in the rear; its passenger compartment must be "in the middle"; and the space in front of the passenger compartment must be approximately the same as that in a "standard American passenger car." Under this standard, any rear engine car would be "inherently dangerous"; any microbus or front-end tractor—both in wide use in 1968 and now—would be declared "inherently dangerous".[30] To avoid liability for negligent design, no manufacturer could introduce any innovative or unique design, even though reasonably calculated to provide some special advantage such as greater roominess. Such a strait-jacket on design is not imposed, whether the rule applied is that of *Evans* or of *Larsen*. If a person purchases a convertible, as *Dyson* makes clear, he cannot expect—and the Court may not impose on the manufacturer the duty to provide him with—the exact kind of protection in a rollover accident as in the "standard American passenger car". The situation is similar when he purchases a microbus: The distance between the front and the passenger compartment is minified in order to provide additional cargo or passenger space just as the convertible is designed to provide openness. It is entirely impermissible to predicate a conclusion of negligent design simply because a vehicle, having a distinctive purpose, such as the microbus, does not conform to the design of another type of vehicle, such as a standard passenger car, having a different nature and utility. As a matter of fact, the defendant offered evidence—unrefuted in the testimony—that its design, at least so far as

"crash space" between the front and the passenger compartment, was equal to or superior to that of other vehicles of like type.

The District Court, however, seems to have accepted plaintiffs' theory, though expressing it somewhat differently from the standard stated by the plaintiffs in their brief. It stated the standard of ordinary care in design to require that a vehicle be able to withstand a "head-on" collision at 40 miles an hour [31] without a violation of "the integrity of the passenger compartment", and held that the defendant had "violated" its duty in failing to meet this standard. Accepting the principle that a manufacturer must anticipate that its product will likely at some point in its use be involved in a collision, does ordinary care demand that, in taking precautions, it must provide against impacts at a speed of 40 miles per hour? Is this the "reasonable risk", as it has been defined in the authorities quoted *supra*, against which the manufacturer must provide protection? And why "40 miles an hour" as the standard anyway? This standard was adopted, it seems clear from the District Court's order, because the plaintiffs contended that a "standard American passenger car" had sufficient "crash space" that its passenger compartment would not have been invaded in a 40 mile impact. This conclusion rests on some measurements made by the plaintiffs' experts in comparing the "crashability" of a microbus and that of a 1966 Ford passenger car. No tests were made by these experts to confirm experimentally these conclusions. The plaintiffs' experts merely measured the distance from the exact front of the microbus and the point where the plaintiff had collided with the interior of the van and compared that distance with the dis-

---

30. The phrases "conduct involving unreasonable risk" of injury and "unreasonably dangerous conduct" are synonymous. See Section 282, Comment c, 2d Restatement of Torts.

31. The van was undoubtedly proceeding at a greater rate of speed than 40 miles an hour

at impact. When the van went over the crest of the hill, its speed was 40 miles an hour but, as it proceeded down the hill to the point of impact, it gathered speed—to such an extent that the driver felt it imperative that he endeavor to slow its speed.

tance between the front and passenger seat of a 1966 Ford passenger car; and because the distance in the latter instance was greater than in the former, they concluded that, had the plaintiff been riding in a 1966 Ford passenger car, she would have escaped injury. But, as we have already seen, in determining whether a vehicle has been negligently designed so far as safety is concerned, the special purpose and character of the particular type of vehicle must be considered, and a microbus is no more to be compared with a standard 1966 passenger type car than the convertible instanced in *Dyson* is to be compared with a standard hard-top passenger car. Both the plaintiffs and the District Court employed an improper standard in determining whether the defendant had been guilty of negligent design.

 It, perhaps, may not be amiss to note that there is not substantial evidence to sustain a finding that as a result of the design of the microbus the plaintiff's injuries were enhanced. *Cf.,* Yetter v. Rajeski, *supra,* at pp. 108–109 (364 F.Supp.). In fact, the record seems clear that in any event the plaintiff, who had made no endeavor to protect herself with a seat belt, would have received severe injuries, irrespective of the type of vehicle she may have been riding in. There was testimony—which was not seriously questioned—that experiments conducted under the auspices of the Department of Transportation indicated that "the average barrier equipment velocity for fatalities, the mean velocity is only 33 miles per hour * * *."[32] It may be that in every case the injuries may be somewhat different but any "head-on" collision at a speed of 40 miles an hour or more will result in severe injuries to the occupants of a vehicle and, certainly in 1968, no design short of an impractical and exorbitantly expensive tank-like vehicle (*see,* Alexander v. Seaboard Air Line Railroad Company, *supra,* 346 F.Supp. 320)

could have protected against such injuries; in fact, it is doubtful that even such a vehicle could have. Can it be said that a manufacturer in 1968 must have, in its design, so built its vehicle as to protect against such an "unreasonable risk of injury"? We think not.

Reversed and remanded with directions to the District Court to enter judgment in favor of the appellants-defendants.