370 F.2d 467
 Eskil L. KARLSON, Plaintiff-Appellee,
v.
305 EAST 43RD STREET CORPORATION, Defendant-Appellant.
 No. 138, Docket 30668.
 United States Court of Appeals Second Circuit.
 Argued Nov. 2, 1966.
Decided Jan. 4, 1967.
 
 Charles F. Krause, New York City (Speiser, Shumate, Geoghan & Krause, New York City, on the brief), for plaintiff-appellee.
 Edmund F. Lamb, New York City (William E. Fay, III, and Purdy, Lamb & Catoggio, New York City, on the brief), for defendant-appellant.
 Before MEDINA, FRIENDLY and SMITH, Circuit Judges.
 MEDINA, Circuit Judge:
 
 
 1
 A New York corporation, owner of a building in New York City, appeals from a judgment entered upon a verdict in the amount of $150,000 after the trial before Judge McGohey of an action for damages for personal injuries suffered by Eskil L. Karlson, a Connecticut commuter, as the result of a fall into an elevator shaft. Jurisdiction is based on diversity and New York law governs throughout.
 
 
 2
 While the building owner claims that Karlson was guilty of contributory negligence and various miscellaneous errors are charged, the principal contention in our view of the case relates to the law applicable to the maintenance of a safety device to prevent access to the elevator shaft when the car is not at the landing. As we find no merit in any of these contentions we affirm.
 
 
 3
 Karlson was an employee of Haskins Laboratories which had its office in a five-story building in Manhattan owned by appellant, 305 East 43rd Street Corporation. The building contained a single, manually operated elevator that had been in use since its imstallation in 1920 without significant alteration. During business hours appellant supplied an operator but at other times, with some exceptions, occupants of the building were forced to walk up the stairs.
 
 
 4
 Because employees of Haskins frequently were in the building on weekends, some few of them sought and obtained permission to operate the elevator tnemselves. Although Karlson was not included in this group, he learned how to use the elevator from appellant's operator, as apparently had most other Haskins employees, and it was his habit to use the elevator when he was in the building on Sundays.
 
 
 5
 On pervious Sundays Karlson came to the street door, opened it with a key he had been given for the purpose, closed the street door and found himself in a vestibule facing and about 10 or 12 feet from the closed solid doors to the elevator shaft. There was a large three-panelled glass transom above the street door and this provided sufficient light for him to see what he was about but he did not think he 'could read a paper in there.' There was an electric light fixture overhead but he had never seen it lighted on other Sundays and he had not been shown where the switch was to turn on this light. He then walked over to the stairway and picked up the key to the elevator that was customarily kept under the bottom step, in accordance with instructions previously given to him by employees of the building, and he used this key to open the closed solid doors leading to the elevator. He pulled out the door to his right, then leaned over and reached inside to turn on the light in the elevator. The light switch was in the car at about knee level. He then put the key back under the stairs, entered the elevator car that was always there at the landing, turned on the power, closed the folding gate and ran the car up to the fifth floor where his research laboratory was.
 
 
 6
 On October 8, 1961 he arrived at the building at about one o'clock in the afternoon and did just what he had done on the earlier Sundays. But on this occasion Robert Epstein, also a Haskins employee, had already run the elevator car to one of the upper floors and he had put the key back under the stairs. Expecting to find the elevator car at the landing, Karlson got the key from under the stairs, opened the door leading to the elevator, reached forward to turn on the light and fell headlong into the shaft. If the door had been equipped with an interlocking device it could not have been opened unless the car was at the landing.
 
 I.
 
 7
 In his instructions to the jury Judge McGohey said:
 
 
 8
 The statute of the State of New York provides-- and this is a quotation: 'In all factory buildings every elevator and elevator opening and the machinery connected therewith, and every hoistway, hatchway and well hole shall be so constructed, guarded, equipped, maintained and operated as to be safe for all persons; the Board shall adopt rules to carry into effect the provisions of this section.'
 
 
 9
 Under the authority of this statute which I have just quoted the State Board of Standards and Appeals has adopted the following rule: 'All manually operated hoistway doors shall be provided with an interlock or electrical contact or other approved devices performing similar functions.'
 
 
 10
 The function of the interlock is defined in another provision as follows: 'An interlock is a device which shall prevent the opening of a hoistway door or doors from the landing side unless the car is standing at that landing.'
 
 
 11
 Now, if you find that the defendant violated any of the foregoing provisions such violations would constitute evidence of negligence and you may consider it as evidence of negligence.
 
 
 12
 If this was error we must remand for a new trial, even if there was other proof from which the jury might have inferred negligence on the part of the building company. This is not only because the verdict was probably based on the failure to provide an interlock as at least the most likely of possible causes of the accident, but because there is surely nothing to give assurance that the verdict was not based on the failure to provide an interlock. If, instead of laboring the orther acts of alleged negligence, appellee had performed the task of thorough research into the background of state laws, New York City Charter provisions and the ordinances and regulations promulgated by a variety of State and City administrative bodies or agencies, as we have been required to do, appellee's brief would have been more helpful to us.
 
 
 13
 Appellant argues that the above-quoted rule of the State Board of Standards and Appeals is not applicable to elevators located within the City of New York because exclusive jurisdiction over such elevators is lodged in the City Board of Standards and Appeals by virtue of the New York City Charter. The resolution of this question requires extensive analysis of the historical development and interrelationship of various statutes, City ordinances and regulations passed from time to time for the purpose of making elevators and the operation thereof safe in buildings situated in the City of New York.
 
 
 14
 In 1916 the New York State legislature, by means of an amendment to the Greater New York Charter, established a City Board of Standards and Appeals. The jurisdiction of this Board included the power to 'Make, amend and repeal rules and regulations regarding the enforcement of those provisions of the labor law and other laws which relate to the consturction, alteration (and) structural changes in * * * elevators * * * within the City of New York.' The statute further provided: 'All rules and regulations made by the board pursuant to this section, shall take the place of the industrial code and of any rules or regulations of the labor department relating to the same subject matter.' N.Y.Laws, 1916, chap. 503, Section 718-a.
 
 
 15
 In granting the City Board of Standards and Appeals this authority, it is clear that the application of state statutes in the Cuty of New York was not automatically terminated but that the City by affirmative act could but was not required to preempt state regulation. When the City first undertook to regulate elevators in 1918, it did so by incorporating state law.
 
 
 16
 Every elevator * * * within the City of New York, in addition to conforming to all provisions of the labor law, building code or other laws or ordinances as are applicable thereto, shall comply with the provisions of these rules. 3 Bull. Board of Standards & Appeals 955 (1918).
 
 
 17
 Not until 1931 did the City itself undertake comprehensive regulation.
 
 
 18
 In 1923, however, pursuant to the authority granted to it by the State Labor Law, the State Board of Standards and Appeals adopted regulations requiring all elevators, with exceptions not here relevant, to be equipped with interlocking devices. New York State Industrial Code 420(f). As these regulations must be deemed a part of the Labor Law insofar as they establish rules governing the maintenance of elevators, this particular State rule requiring interlocking devices became applicable to the elevator in 305 East 43rd Street, New York City, on its effective date, March 1, 1923. Thus from 1923, the elevator involved in this accident was operated in violation of the applicable regulations.
 
 
 19
 The question then is whether any later action by the City had the effect of dissolving these violations and of reducing the standards for the safe operation of elevators in the City of New York. The 1931 revision by the City Board of Standards and Appeals provided that elevators 'legally installed prior to the adoption of these Rules may be used without being reconstructed to comply with these Rules.' When this particular elevator was installed in 1920 it conformed to the then existing law. But we do not believe the word 'installed' in the 1931 revision should be read to mean the date of construction. Such a reading would lead to the absurd conclusion that all elevators located within New York City were governed by the various rules in effect on the date of their construction. Rather, we think that by the use of the word 'installed,' the draftsman intended to refer to the legality of the elevator as of 1931. That is to say, the regulation should be read as 'elevators legally installed and maintained' prior to 1931 may be used 'without being reconstructed.' To hold the contrary would wipe out eight years of continuous violations in this very building and reduce the safety standards applicable to this class of elevators. A result so unusual could be supported only if there was before us clear proof that the City Board of Standards and Appeals intended such a result. No such proof, however, has been forthcoming and our research has found none.
 
 
 20
 The current New York City regulations are contained in the Administrative Code of 1938. The provisions of this codification, similar to the 1931 regulations, apply only prospectively. Elevators 'legally installed' may be used without change. As this provision parallels that contained in the 1931 regulation, it must be similarly construed.
 
 
 21
 Thus there is nothing which excludes the application of the State Labor Law and the regulations adopted pursuant to that law require that the elevator involved in this suit be equipped with an interlocking device. Judge McGohey's charge was proper.
 
 
 22
 Appellant argues that Section 666 of the New York City Charter confers upon the City Board of Standards and Appeals exclusive jurisdiction over elevators within the City of New York, and that, therefore, no State law or regulation could apply. Apparently, appellant was unaware of the 1918 City regulation which incorporated State law. All subsequent City enactments continued this incorporation, as we have shown.
 
 II.
 
 23
 Appellant further complains of the admission of evidence that immediately following Karlson's accident appellant installed an interlocking device. Under both New York and federal Law such evidence is admissible only if it bears on a disputed issue of control. Hadges v. New York Rapid Transit Corp., 259 App.Div. 154, 18 N.Y.S.2d 304; Columbia & P.S. R.R. v. Hawthorne, 144 U.S. 202, 12 S.Ct. 591, 36 L.Ed. 405 (1892); see 2 Wigmore, evidence 283(4). Whether and to what extent, any issue of control remained in the case by the time of trial is unclear.
 
 
 24
 In its answer, appellant did not admit that it controlled the elevator or, more specifically, it denied that it controlled the elevator on the day of the accident. In the pre-trial order, it was agreed that 'no amendments to the pleadings are allowed' and that 'no issues raised by the pleadings are abandoned.' Appellee, both to meet the issue of control and to show the scene of the accident, put in evidence a photograph of the elevator taken after the safety lock was installed. See 2 Wigmore, Evidence 283(4). While the device was open to the view of anyone looking at the photograph, including any juror familiar with such matters, no comment on the subject was made by either counsel at the time the photograph was received in evidence. Later during the trial when appellee sought to bring up the question of repairs, appellant strenuously objected. Appellant argued there was no issue of control in general framed by the pleadings but only of control on the day of the accident and further that in the pre-trial order it had conceded that it 'maintained' the elevator. Counsel for appellant then insisted he had no intention to dispute the issue of control.
 
 
 25
 Judge McGohey concluded that the appellee should be permitted to prove and to explain the presence of the safety device to prevent adverse and unwarranted inferences by the jury. We think appellant is chargeable with much of the confusion surrounding this issue of control and should have objected to the photograph when it was offered in evidence if it wished to keep the evidence of repairs from the jury. Moreover, when the evidence of the installation of the interlock was received, Judge McGohey instructed the jury that they must restrict their consideration of this evidence to the limited issue of control, which was also explained to the jury, and that no other inferences might be drawn. Under the circumstances of this case we think this was sufficient.
 
 
 26
 We think the issue of contributory negligence was clearly for the jury to determine. Nor was there error in the instructions on the subject of causation. No particular formula is required. Other claims of alleged error have been considered by us but we find them devoid of merit.
 
 
 27
 The verdict is large but not so large as to give us the impression that a reversal or remittitur is necessary to prevent a gross miscarriage of justice. Dagnello v. Long Island R.R. Co., 289 F.2d 797 (2 Cir. 1961).[1] The proofs show permanent physical injuries including a permanent impairment of memory and ability to communicate. Karlson is a physicist with a life expectancy of about thirty years. The jury might well have concluded that his earning capacity, which was superior prior to the accident, had been substantially reduced.
 
 
 28
 Affirmed.
 
 
 
 [1]
 As remittitur concerns the relationship between the federal judge and jury, it is a question of federal law. Byrd v. Blue Ridge Rural Electric Cooperative, Inc., 356 U.S. 525, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958)