Turi CAIAZZO and Frank Caiazzo, Plaintiffs-Appellees,

v.

VOLKSWAGENWERK A. G., Defendant-Appellant,

and

Volkswagen of America, Inc., Bruce Beard Volkswagen, Inc. and James Valentine, Defendants.

No. 969, Docket No. 79–7419.

United States Court of Appeals, Second Circuit.

Argued April 3, 1980.

Decided April 2, 1981.

Jay W. Dankner, New York City (David L. Perkins, Lipsig, Sullivan, Mollen & Liapakis, P.C., New York City, on the brief), for plaintiffs-appellees.

Michael Hoenig, New York City (Herbert Rubin, Edward L. Birnbaum, Jeffrey L. Chase, Herzfeld & Rubin, P.C., New York City, on the brief), for defendant-appellant.

Before MANSFIELD and NEWMAN, Circuit Judges, and GOETTEL, District Judge.*

* Honorable Gerard L. Goettel, Judge of the United States District Court for the Southern District of New York, sitting by designation.

GOETTEL, District Judge:

Volkswagenwerk Aktiengesellschaft ("VWAG") appeals from a judgment entered against it on May 9, 1979 for damages arising out of an automobile collision between plaintiffs-appellees, Turi and Frank Caiazzo, who were driving a minibus manufactured by appellant, and defendant James Valentine, who has not joined in this appeal.[1]

The Caiazzos' claim against VWAG arises out of an area of tort law that has come to be. known as the "crashworthiness" or "second collision" doctrine.[2] Under this theory of liability, the claimant does not allege that any defect in the automobile caused the accident; rather, the allegation is that the claimant's injuries were more severe than what they would have been had the car been properly designed. Appellant raises several significant issues connected with this theory of liability. This being a diversity action, we must apply New York law in resolving these issues, *Erie Railroad v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), and must join other federal courts in the difficult task of predicting a state court's interpretation in this uncertain area of the law. For the reasons set forth below, we reverse in part the judgment of the district court and remand for a new trial on damages.

## I. The Factual Background

On January 17, 1972, Turi Caiazzo, accompanied by her husband, Frank Caiazzo, was driving a 1965 Volkswagen minibus westbound in the center lane of the Long Island Expressway. Neither was wearing the lap seat belt, which was anchored to the floor of the van. Defendant Valentine, proceeding at a speed estimated to be between 50 and 65 miles per hour, crashed into the rear of the Caiazzos' van causing it to turn completely over and reverse direction. The van came to a rest facing east on the right shoulder of the expressway approximately 150 feet west of the point of impact. Both Turi and Frank Caiazzo were ejected from the van and were apparently knocked unconscious.[3] Frank Caiazzo regained consciousness 100 feet west of the van on the shoulder of the expressway.[4] He found Turi on the center lane of the expressway opposite the van. Neither of the Caiazzos has a detailed recollection of the accident.

Turi Caiazzo, who had a life expectancy of about 50 years at the date of trial, suffered a severe cerebral concussion, hematoma over the occipital region of her head, total accident amnesia, a severe fracture of her right shoulder blade, various cuts and scrapes, a myocardial contusion, and frac-

1. Defendant Valentine entered into a stipulation with the Caiazzos and with VWAG on August 2, 1979 dismissing Valentine's notice of appeal.

2. "Crashworthiness" means "the protection that a passenger motor vehicle affords its passengers against personal injury or death as a result of a motor vehicle accident." 15 U.S.C. § 1901(14). Coincidentally, the Caiazzos' reconstruction expert, William Steiglitz, is credited with coining the term "crashworthiness" in a paper he presented at the Institute of Aeronautical Sciences in 1950.

   The term "second collision" usually refers to the collision between a passenger and an interior part of the vehicle following an impact or collision. The term has also been applied to ejection cases like this one in which the second collision is between an occupant of the car and the ground. *See, e. g., Jeng v. Witters*, 452 F.Supp. 1349 (M.D.Pa.1978), *aff'd without opinion*, 591 F.2d 1335 (3d Cir. 1979).

   The two terms tend to be used interchangeably, although some commentators distinguish between the two. *See* Foland, *Enhanced Injury: Problems of Proof in "Second Collision" and "Crashworthy" Cases*, 16 Washburn L.J. 600, 606 (1976). We will use the term "second collision," since the language of one of the New York cases on this subject speaks of vehicles *not* having to be made crashworthy. *Bolm v. Triumph Corp.*, 33 N.Y.2d 151, 157, 305 N.E.2d 769, 772, 350 N.Y.S.2d 644, 649 (1973).

3. Whether or not the Caiazzos were ejected from the van was contested at trial, and the jury found that they were ejected. VWAG does not contest this finding in this appeal.

4. It is not clear exactly how he got to this location. The evidence does not suggest that he was thrown 100 feet in the air; yet his testimony was that he regained consciousness 100 feet from the vehicle in the same direction in which the vehicle had been traveling. The only logical conclusion is that he must have crawled there.

tures to both ankles. (The ankle injuries were the most serious of these injuries.) As a result of these injuries, Turi was confined to a wheelchair for about two months and for some time thereafter had to use crutches. Her ankles are so sensitive that she must avoid anyone's brushing against her foot. In addition, traumatic arthritis in her right ankle has so limited the function of the ankle that she cannot put on pants.

Frank Caiazzo's injuries, although severe, were less extensive than his wife's. He sustained a compression fracture of the first lumbar vertebra and a cerebral concussion. Although his back hurts him occasionally when he plays sports, he made no claim of loss of earnings or for any diminution in earning capacity. His life expectancy at the time of trial was about forty-eight years.

In 1973 the Caiazzos instituted an action against the operator of the other vehicle, Valentine, and against VWAG, the manufacturer of the Caiazzos' van, for aggravation of injuries under a "second collision" theory. *See Bolm v. Triumph Corp.*, 33 N.Y.2d 151, 305 N.E.2d 769, 350 N.Y.S.2d 644 (1973). The Caiazzos alleged that their injuries were aggravated by a defective door latch assembly, which caused the doors to open during the collision, resulting in the occupants' being ejected from the van, and by other defects in the automobile.[5]

After a four-week trial, the late Judge Dooling submitted the case to the jury upon twenty-five interrogatories. The jury found, *inter alia:* (1) that Valentine's negligence was the proximate cause of the accident; (2) that the door handle design was defective; (3) that the Caiazzos were ejected from the van because of the defect; (4) that the Caiazzos' injuries were aggravated beyond the injuries they would have sus-

tained if there had been no defect; (5) that Turi Caiazzo's total damages were $750,000, of which $500,000 (or two-thirds of her total damages) represented the aggravation of her injuries due to defective door handle design; (6) that Frank Caiazzo's total damages were $200,000, of which $150,000 (or three-fourths of his total damages) represented the aggravation of his injuries due to the defective door handle design; and (7) that the Caiazzos' injuries would have been reduced by 25% if they had been wearing seat belts. In sum, the jury concluded that Turi Caiazzo was entitled to recover $562,500 against Valentine and $375,000 of that amount against VWAG jointly.[6] Frank Caiazzo was entitled to recover $150,000 against Valentine, for $112,500 of which VWAG was found jointly liable.

VWAG moved for judgment notwithstanding the verdict and a new trial and renewed its motion for a directed verdict. Judge Dooling denied these motions, but proposed a remittitur of $100,000 with respect to the $200,000 awarded to Frank Caiazzo and $350,000 with respect to the $750,000 awarded to Turi Caiazzo, before the 25% reduction for the Caiazzos' failure to wear seat belts. *Caiazzo v. Volkswagenwerk, A.G.*, 468 F.Supp. 593 (E.D.N.Y.1979). This resulted in a final judgment for Frank Caiazzo of $75,000 against Valentine, of which $56,250 was against VWAG jointly, and a judgment for Turi Caiazzo of $300,000 against Valentine, of which $200,000 was against VWAG jointly. The Caiazzos accepted the remittitur and judgment was entered on May 5, 1979.

## II. The Issues on Appeal

■ VWAG raises a variety of issues[7] in its appeal: (1) whether there was sufficient

5. In addition, Turi Caiazzo alleged that her injuries were enhanced by a defectively designed seat track and runner assembly. The jury found that the seat design was not defective. However, this additional allegation added an extra layer of complexity to the case, which bears on the issues in this appeal.

6. It is not disputed that defendant Valentine is liable for all of the Caiazzos' damages including

those caused by the design defect. *See Zillman v. Meadowbrook Hospital Co.*, 45 A.D.2d 267, 270, 358 N.Y.S.2d 466, 469 (2d Dep't 1974); Restatement (Second) of Torts § 435 (1965).

7. In addition to the three issues discussed in the text, VWAG also contends that the trial court erred in denying its motion to limit the Caiazzos' proof with respect to the door defect. VWAG argues that the Caiazzos' answers to

evidence to support a finding of enhanced injuries or, in the alternative, whether the evidence necessitated a finding that all of plaintiffs-appellees' injuries would have been mitigated by wearing seat belts; (2) whether the trial court erred in concluding that plaintiffs-appellees did not have the burden of segregating the enhanced injuries from those resulting from the collision; and (3) whether the trial court erred in concluding that plaintiffs-appellees' failure to wear seat belts could not constitute contributory negligence.[8]

### III. The Legal Background

█ The second collision doctrine of liability is relatively simple. Since manufacturers are already under a duty to construct vehicles that are free of latent defects, *MacPherson v. Buick Motor Co.*, 217 N.Y. 382, 111 N.E. 1050 (1916), it follows that the manufacturer's liability for injuries proximately caused by these defects should not be limited to collisions in which the defect causes the accident, but should extend to situations in which the defect caused injuries over and above that which would have occurred from the accident, but for the defective design. *Larsen v. General Motors Corp.*, 391 F.2d 495 (8th Cir. 1968); *Bolm v. Triumph Corp., supra.*

What appears to be simple in theory, however, presents a myriad of problems in the litigation of this principle. *See* Foland, *Enhanced Injury: Problems of Proof in* "Second Collision" and "Crashworthy" *Cases*, 16 Washburn L.J. 600 (1976). This appeal raises some of the thornier issues: (1) the extent of the plaintiff's burden of proof regarding causation, *i. e.*, to what degree must the plaintiff segregate the enhancement injuries from the primary injuries; (2) the effect of the plaintiff's contributory fault, in particular, the plaintiff's failure to use a seat belt, on the plaintiff's claim that the automobile is defective, where the defendant argues that the "second collision" would not have occurred had seat belts been used; and (3) the interrelation between (1) and (2).

The problem with the litigation of crashworthiness cases generally is that, except for the instance in which the injuries caused by the design defect are clearly distinguishable from those caused by the initial collision (*e. g.*, burn injuries from the explosion of a defectively designed gas tank, as in *Turcotte v. Ford Motor Co.*, 494 F.2d 173 (1st Cir. 1974)), the evidence will necessarily include a determination of what might have happened in the collision under different circumstances. The problem, as the trial court pointed out, is that "[w]hat might have happened is rarely susceptible of proof." *Caiazzo v. Volkswagenwerk, A.G., supra*, 468 F.Supp. at 598.

In this case, the design defect and seat belt issues add considerably to the jury's tasks. Not only must the jury attempt to determine what injuries each plaintiff

---

interrogatories suggested that the alleged defect was in the design of the door latch rather than in the design of the door handles. In particular, it claims that the disposal of the van, prior to their becoming aware that the Caiazzos' claim included the door handles, extremely prejudiced it.

VWAG's claim of surprise is hypertechnical. *See Pherson v. Goodyear Tire & Rubber Co.*, 590 F.2d 756, 759 (9th Cir. 1978). The Caiazzos' responses to interrogatories include the statement that "plaintiffs were caused to be propelled . . . as a result of defective door latch mechanisms, door frame and seat track assemblies." Record at A22. The phrase door latch mechanism is broad enough to include the design of the inner and outer door handles. Moreover, the Caiazzos' expert, William Steiglitz, fully described this door defect theory during his deposition in 1977. VWAG had ·some

four years to inspect the van. Furthermore, it had close to one year between the Steiglitz deposition and trial to object to the Caiazzos' theory regarding the defective handle design, if indeed it was caught off guard by the Caiazzos' responses to interrogatories. Accordingly, we find that the trial court did not abuse its discretion by denying VWAG's motion to limit the Caiazzos' proof.

8. The accident occurred in 1972. New York did not adopt a comparative negligence standard until September 1, 1975. N.Y.Civ. Prac.Law & R. § 1413 (McKinney 1976). Consequently, contributory negligence is the standard to be applied here. *Bankhaus Hermann Lampe KG v. Mercantile-Safe Deposit and Trust Co.*, 466 F.Supp. 1133, 1146 (S.D.N.Y. 1979).

would have suffered if the doors had not opened, but it must also determine what enhanced injuries each suffered by reason of the doors opening and what part of the enhanced injuries, if any, would have been avoided had they been wearing seat belts.[9]

### IV. The Trial Court's Approach

The trial court ruled that the Caiazzos need prove only what was referred to as the "fact" of enhancement—"that the defect in design was a factor in causing [some of] plaintiffs' injury and damage." *Caiazzo v. Volkswagenwerk, A.G., supra,* 468 F.Supp. at 601. VWAG, in seeking to limit its liability to the enhanced damages, had the burden of apportionment, *i. e.,* it had to segregate the injuries between those caused by the collision, by the alleged design defects,[10] and by the nonuse of the seat belts.

While we appreciate the difficulties of predicting how the New York courts would deal with these intertwining issues, we think the trial court's approach in unraveling these problems places too heavy a burden on the manufacturer and contradicts the theoretical underpinnings of the second collision doctrine. Placing on VWAG the burden of apportioning between the collision injuries and the enhanced injuries, in addition to the burden of proving what injuries would have been reduced if the Caiazzos had worn their seat belts, corners the manufacturer into offering evidence of a plethora of hypothetical and speculative possibilities. For purposes of apportioning damages, VWAG would have had to distinguish between the types of injuries the Caiazzos would have incurred if: (1) they were wearing seat belts and the doors did not open; (2) they were not wearing seat belts and the doors did not open; (3) they were wearing seat belts and the doors did open; and (4) they were not wearing seat belts and the doors did open (which appears to be what occurred in this case).[11]

The upshot is that the manufacturer would be forced to prove a part of plaintiffs-appellees' case. A simpler, fairer, and conceptually more sound approach, is to require the Caiazzos to establish the extent of enhanced injuries attributable to the defective design.

█ With respect to the seat belt issue, the burden of proving the consequences of the Caiazzos' failure to wear seat belts was properly placed with VWAG. We affirm this part of the district court's decision as well as its instruction to the jury that the seat belt issue could be considered only in assessing damages. *See Spier v. Barker,* 35 N.Y.2d 444, 323 N.E.2d 164, 363 N.Y.S.2d 916 (1974).

### V. The Second Collision Doctrine

The seminal case for the second collision doctrine is *Larsen v. General Motors Corp.,*

9. With respect to their overall injuries from both "collisions" for which Valentine was liable, *see* note 6 *supra,* the jury found that 25% of their total injuries were due to the failure to wear seat belts. The jury also found that 25% of the enhanced injuries were due to the failure to wear seat belts. The enhanced injuries were caused by the ejection. Since it is agreed that the Caiazzos would not have been ejected had they been wearing their seat belts, it is clear that the seat belt issue affects VWAG's liability much more than Valentine's. The jury's failure to apportion the effect of the nonuse of seat belts indicates that the jury did not understand, or was improperly charged, as to the seat belt issue.

10. There were two alleged design defects, the door latch assembly and the seat track and runner assembly. Consequently, VWAG not only had the burden of distinguishing between the injuries caused by the collision and those caused by the alleged design defects, but it also had to segregate those caused by the door design and those caused by the seat design, *and* at the same time argue that there was no defect at all.

11. Situations (1) and (2) do not directly involve VWAG, since

Valentine would be solely liable if the doors had not opened. Nevertheless, the trial court, in effect, required VWAG to establish situations (1) and (2) because of its ruling that VWAG must distinguish the injuries caused by the opening of the doors from the injuries caused by the rest of the collision. Our decision limits VWAG's involvement to where it properly belongs and requires VWAG to establish only what injuries were caused by the Caiazzos' failure to wear seat belts. *See* Sections VII and VIII, *infra.*

*supra.* *Larsen* involved a head-on collision in which the steering mechanism in the plaintiff's vehicle displaced rearward and struck the plaintiff in the head. The plaintiff alleged that, while the defective steering assembly did not cause the accident, it exacerbated the injuries he would have suffered in the collision absent the defective assembly. General Motors, the manufacturer of the vehicle, argued that it had "no duty" to design an automobile that is " 'safe' or 'safer' to occupy during collision impacts." 391 F.2d at 497. The district court, relying on *Evans v. General Motors Corp.*, 359 F.2d 822 (7th Cir.), *cert. denied*, 385 U.S. 836, 87 S.Ct. 83, 17 L.Ed.2d 70 (1966), granted summary judgment for General Motors. In *Evans*, the Seventh Circuit ruled that manufacturers had no duty to make automobiles crashworthy, *id.* at 824, because collisions are not an intended use of automobiles. In *Larsen*, the Eighth Circuit, rejecting the *Evans* approach, ruled that, since collisions are a foreseeable, though unintended, result of the normal operation of automobiles, a manufacturer "is under a duty to use reasonable care in the design of its vehicle to avoid subjecting the user to an unreasonable risk of injury in the event of a collision." 391 F.2d at 502. *Larsen* did not hold, however, that manufacturers are under a duty to design "accident-proof or fool-

proof" automobiles, *id.* at 502, nor did it hold that manufacturers are "insurers." *Id.* at 503. In the flurry of litigation that followed the decision, some jurisdictions accepted or expanded *Larsen*, while others adopted the *Evans* approach.[12] Foland, *supra*, at 600–01.

The New York courts addressed the issue in *Bolm v. Triumph Corp., supra.* *Bolm* involved a collision between an automobile and a motorcycle. Plaintiff, the motorcyclist, in addition to suing the owner and operator of the automobile, sued the manufacturer of the motorcycle, alleging that the placement of the metal luggage rack on top of the motorcycle's gas tank in front of the saddle constituted a design defect that exacerbated plaintiff's injuries. The New York Court of Appeals, rejecting a prior New York decision that held that second collision injuries were not actionable, *Edgar v. Nachman*, 37 A.D.2d 86, 323 N.Y.S.2d 53 (3d Dep't 1971), adopted the second collision theory of liability, ruling that manufacturers' liability extended to "unreasonably dangerous (latent) design defects which enhance or aggravate injuries." *Bolm, supra*, 33 N.Y.2d at 158, 305 N.E.2d at 773, 350 N.Y.S.2d at 650.[13]

Neither *Bolm* nor subsequent New York decisions provide guidance, however, as to exactly how these cases are to be litigated. Specifically, they do not answer the ques-

**12.** Laws and regulations written in response to the energy crisis require automobile manufacturers to design vehicles to obtain better gas mileage. As a result, vehicles are being made lighter and, consequently, less crashworthy. Some commentators have suggested that the scope of the second collision doctrine should be determined by specific product safety standards established by legislatures. *See, e. g.*, Hoenig, *Understanding "Second Collision" Cases in New York*, 20 N.Y.L. Forum 29 (1974); Henderson, *Judicial Review of Manufacturers' Conscious Design Choices: The Limits of Adjudication*, 73 Colum.L.Rev. 1531 (1973).

**13.** While there is language in *Bolm* in which the judges of the New York Court of Appeals state that they "reject the 'second collision rule' in favor of traditional rules of negligence and warranty," 33 N.Y.2d at 159, 305 N.E.2d at 774, 350 N.Y.S.2d at 651, the effect of the opinion is that New York adopted the second collision rule as that term is currently used. The "second collision rule" mentioned in *Bolm*

refers to *Edgar v. Nachman, supra*, in which the New York Supreme Court, Appellate Division, Third Department, ruled that second collision injuries are not actionable.

Commentators have noted that *Bolm* does not adopt *Larsen, supra, in toto. See* Hoenig, *Understanding "Second Collision" Cases in New York*, 20 N.Y.L. Forum 29, 44 (1974). The major difference between the two cases is the distinction in *Bolm* between latent and patent defects. This is a carryover from the seminal decision of *MacPherson v. Buick Motor Co., supra.* *Larsen* and *Bolm* also differ on the treatment of the fault of the user of the automobile. *Larsen* extends the manufacturer's liability to collisions "with or without the fault of the user." 391 F.2d at 502. *Bolm*, on the other hand, holds that if a plaintiff could have averted his injury by the exercise of reasonable care, the manufacturer is not liable. 33 N.Y.2d at 159, 305 N.E.2d at 773, 350 N.Y.S.2d at 650.

tions presented in this case: What causal link must a plaintiff establish between the defect and the injuries? What bearing will a plaintiff's own failure to use available safety devices have on his claim that the vehicle is unsafe? Before we consider these questions, however, we must first address VWAG's claim regarding sufficiency of the evidence.

## VI. Sufficiency of the Evidence

█ VWAG contends that, regardless of the resolution of these various burden of proof issues, it is entitled to a directed verdict either because the Caiazzos have failed to offer *any* evidence of enhancement, or, in the alternative, because any injuries attributable to the defect were barred by the seat belt defense.

With respect to the verdict, the trial court commented that "[a]n allocation of the kind which the jury made . . . does not reveal its logic, and cannot be pinned to specific items of evidence." *Caiazzo v. Volkswagenwerk, A.G.*, supra, 468 F.Supp. at 598. We agree. We also agree, *dubitante*, with the trial court's conclusion that the Caiazzos submitted sufficient evidence of enhancement, which would have occurred even if they were wearing seat belts, to create a jury issue. We also concur with the court's decision that the evidence on nonuse of seat belts does not *necessarily* mandate a finding of total mitigation of the Caiazzos' enhanced injuries.

The witnesses on the design defect and causation issues for the Caiazzos were William Steiglitz, an accident reconstruction expert, and Dr. Norman Silver, the Caiazzos' treating physician. In addition to his testimony regarding the manner of ejection and the kinematic effects of the accident sequence, Steiglitz, in response to hypothetical questions, testified that the defects in the doors were substantial factors in causing the injuries sustained by the Caiazzos. The weight to be accorded to his testimony was within the province of the jury to decide. *See e. g., Manning v. New York Telephone Co.*, 388 F.2d 910, 912 (2d Cir. 1968).

Dr. Silver, in response to two hypothetical questions based on the testimony of Frank Caiazzo, testified that some of his injuries occurred between the time that Frank Caiazzo said he saw "the ground coming up at him" and the end of the accident sequence. Thus, the trial court noted:

> The jury could have accepted or rejected an expert's opinion that Frank Caiazzo's compression fracture was more likely to have occurred when he was thrown from the van rather than when he was in it. The jury could have accepted or rejected an expert opinion that the fracture of plaintiff Turi Caiazzo's right shoulder blade came about from contact with the seat back and the bulkhead behind it, and could, with more confidence, have found that her right foot injuries were brought about from some kind of twisting contact with the pedals on the floor of the van in front of the driver's seat. The jury had before it an opinion that the hematoma over the occipital region of Turi Caiazzo's head (at the back of the skull) could have resulted either from her head striking the door frame or the ground; the same expert indicated that the left ankle injury could have occurred when plaintiff Turi Caiazzo was thrown from the van.

Record at A206–07.

Turning to the effect of the Caiazzos' failure to wear seat belts, it is not disputed that they would not have been ejected had they been wearing them. There was some evidence, however, to the effect that the Caiazzos *might* have incurred some of their enhanced injuries, or possibly other injuries even if they had been belted during the course of the roll-over. VWAG did not offer uncontradicted evidence to establish that no reasonable jury could find that the Caiazzos' use of the lap belts would have totally mitigated the enhanced injuries attributable to the opening of the doors. The jury found that both the initial injuries and the enhanced injuries would have been reduced by the same proportionate amount (25%) if seat belts had been worn, but there was no evidence of (and the jury was not

asked to determine) what enhanced injuries, resulting from the opening of the doors, would have occurred within the car had the Caiazzos been wearing belts.

We are not persuaded, however, that the jury's apportionment of damages between the initial accident, the design defect, and the failure to wear seat belts, is consistent with the evidence. The most serious consequence of the design defect was that the Caiazzos were ejected from the van. Both the Caiazzos' expert and VWAG's expert, however, agreed that the Caiazzos would not have been ejected had they been wearing their seat belts.[14] The jury nevertheless concluded that wearing the seat belts would have reduced the injuries caused by the design defect by only 25% even though the most serious consequence of the design defect, the ejection from the van, would not have occurred. This conclusion simply does not make sense. Another problem with the verdict is the disproportionately high percentage of Turi Caiazzo's injuries attributed to the design defect. The evidence indicates that the most serious of her injuries, the ankle fractures, occurred *inside* the van. The jury concluded, however, that two-thirds of her injuries were caused by her being ejected from the van. But there was no evidence that her ankle fractures, her most serious and painful injuries, resulted from the ejection. *See* note 9 *supra.*

We need not rule on the trial court's valiant attempt to rationalize these inconsistencies in the jury verdict (which it acknowledged was "inscrutable"), since we are granting a new trial on other grounds. Since we have concluded that there was sufficient evidence to submit the case to the jury, we now must consider how the jury should have been instructed as to the burden of proof in a second collision situation

and as to the legal effect of the failure to use seat belts.

## VII. The Burden of Proof

■ Decisions following *Larsen* have treated the plaintiff's burden of proof in two different ways. One group of decisions, the most notable of which is *Huddell v. Levin,* 537 F.2d 726 (3d Cir. 1976), requires a plaintiff to distinguish between those injuries that are attributable to the accident and those that are attributable to the alleged design defect. *See Stonehocker v. General Motors Corp.,* 587 F.2d 151, 158 (4th Cir. 1978) ("the burden is on the plaintiff either to establish that he would have suffered no injury or the extent of the injury he would have suffered, had the vehicle been properly designed"); *Jeng v. Witters,* 452 F.Supp. 1349, 1361 (M.D.Pa. 1978), *aff'd without opinion,* 591 F.2d 1335 (3d Cir. 1979); *Yetter v. Rajeski,* 364 F.Supp. 105, 109 (D.N.J.1973); *Foland, supra.*

Other jurisdictions have ruled that a plaintiff need not prove the nature and extent of the enhanced injuries, *Fox v. Ford Motor Co.,* 575 F.2d 774 (10th Cir. 1978),[15] but need only offer "[s]ome evidence of enhancement" to present a jury issue. *Lahocki v. Contee Sand & Gravel Co.,* 41 Md.App. 579, 398 A.2d 490, 501 (Ct. Spec.App.1979), *rev'd on other grounds sub nom. General Motors Corp. v. Lahocki,* 286 Md. 714, 410 A.2d 1039 (1980) (emphasis in original). *See Huddell v. Levin, supra,* 537 F.2d at 744–47 (concurring opinion). *See generally* Note, *Apportionment of Damages in the "Second Collision" Case,* 63 Va.L.Rev. 475 (1977); Comment, *Automobile Design*

---

**14.** VWAG's expert was asked for his opinions as to what injuries were due to the defective door latch assembly, Record at A1022–23, and as to what injuries were due to the failure to wear seat belts. Record at A1024. This expert was *not* asked the crucial question as to what additional injuries would have been sustained as a result of the defective door latch assembly had the Caiazzos been wearing their seat belts.

**15.** In *Fox,* the court instructed the jury that plaintiffs could recover only if the defect was a proximate cause of plaintiffs' injuries and that "the proximate cause of an injury is that cause which is natural and continuous, unbroken by an efficient intervening cause, which produces the injury and without which the injury would not have occurred." 575 F.2d at 787. In the instant case, the seat belt question presents a causation issue. *See* Part VIII *infra.*

*Liability: Larsen v. General Motors and Its Aftermath*, 118 U.Pa.L.Rev. 299 (1969).[16]

Judge Dooling, relying on a statement in *Bolm v. Triumph Corp.*, 33 N.Y.2d 151, 305 N.E.2d 769, 350 N.Y.S.2d 644 (1973), that the manufacturer's liability is to be determined by the traditional rules of negligence and strict liability, applied the Restatement (Second) of Torts §§ 433A and 433B (1965) and concluded that VWAG had the burden of apportionment of the injuries. *Caiazzo v. Volkswagenwerk, A.G., supra,* 468 F.Supp. at 602–04. That language in *Bolm,* however, refers to determining the threshold question of whether a manufacturer is liable at all; it does not concern what damages the manufacturer will be liable for, nor does it frame the elements of a plaintiff's prima facie case.

We do not agree that it is adequate to prove only the "fact" of damage and, instead, adopt, in principle, the approach taken by the Third Circuit in *Huddell v. Levin, supra. Huddell* involved an allegedly defective head restraint. Plaintiff's decedent's head struck the head restraint after his car was hit in the rear. Plaintiff claimed that the head restraint had an unusually sharp edge, which caused plaintiff's decedent's death when it struck him on the rear of the head. At trial, plaintiff offered proof that the head restraint was defective and that the defect was a proximate cause of death. The Third Circuit ruled that this proof was insufficient to make out a prima facie claim under a second collision theory of liability and held:

[C]rashworthy or second collision cases impugning the design of an automobile require a highly refined and almost invariably difficult presentation of proof in three aspects. First, in establishing that the design in question was defective, the plaintiff must offer proof of an alternative safer design, practicable under the circumstances .... Second, the plaintiff must offer proof of what injuries, if any, would have resulted had the alternative, safer design been used.... Third, ... the plaintiff must offer some method of establishing the extent of enhanced injuries attributable to the defective design. 537 F.2d at 737–38.

While we do not predict that New York would adopt this mechanical formula of proof, the plaintiff should be required to prove the extent of the enhanced injuries attributable to the defective design, particularly in a case such as this, where the wearing of seat belts would have eliminated most, if not all, of the enhanced injuries resulting from the design defect. This evidence will generally, perhaps even necessarily, be in the form of expert testimony. *See Yetter v. Rajeski, supra,* 364 F.Supp. at 109; *Horn v. General Motors Corp.,* 17 Cal.3d 359, 551 P.2d 398, 131 Cal.Rptr. 78 (1976); *Foland, supra,* at 616–19.

To require proof merely of the fact of enhancement permits a jury to engage in undue speculation as to the causes of various injuries and gives a jury dangerous latitude in assigning responsibility to the defendant who appears most able to pay a

---

**16.** The decisions are not as irreconcilable as they may appear, however. The decisions are in agreement that the manufacturer is liable only for the enhanced injuries, and that a plaintiff must prove some causation between the alleged defect and the enhanced injuries. Their point of departure is on the degree of proof that is required. Those cases that place the burden of apportionment on the manufacturer either involve second collision injuries that are clearly distinguishable from those suffered during the initial collision (in which case the question of who has the burden of apportionment is insignificant), *see, e. g., Polk v. Ford Motor Co.,* 529 F.2d 259 (8th Cir.), *cert. denied,* 426 U.S. 907, 96 S.Ct. 2229, 48 L.Ed.2d 832 (1976); *Turcotte v. Ford Motor Co., supra,* or involve a wrongful death action, in which the cause of action is "different from [the] cause of action for injuries, which has different elements and a different measure of damages such as pain and suffering." *Fox v. Ford Motor Co., supra,* 575 F.2d at 787. Decisions that place the burden of proving the nature and extent of the injuries on the plaintiff tend to involve injuries such as broken bones, which are alleged to have been made more severe because of the defect. *See, e. g., Stonehocker v. General Motors Corp., supra.* No rational basis exists in either the theory of second collision liability or the precedents to tie the burden of proof to the nature of the claimant's injuries. Nevertheless, it appears that it is this factual distinction that distinguishes these cases.

plaintiff's award. The case at bar illustrates the problem. While we have concluded that there was probably sufficient evidence of the fact of enhancement to withstand a motion for directed verdict, the evidence on this point was quite thin. The Caiazzos presented no evidence as to what injuries would have resulted from the impact had there been no design defect. Moreover, as the trial court noted, the expert testimony could "easily" have done more "to elucidate the mechanics of the accident, to indicate the different reconstructions of the sequence that might be inferred, and to describe the physical injuries sustained by each plaintiff and the damaging forces that could be inferred from those injuries." *Caiazzo v. Volkswagenwerk, A.G., supra*, 468 F.Supp. at 598. The expert evidence was to the effect that various of the Caiazzos' injuries could have been sustained either from the alleged design defects or from the primary collision. The Caiazzos' expert suggested that even belted riders could sustain crushed skulls in a roll-over, but he did not establish whether belting could have prevented distinctly identifiable injuries resulting from the opening of the doors. Without evidence as to what injuries would have resulted had the Caiazzos not been ejected, the jury had to speculate and hypothesize as to which injuries resulted from the defective door design. The disharmony between the jury's verdict and the evidence, *see* discussion *supra*, exemplifies the problem with this approach.

We realize that a plaintiff's burden of offering evidence of what injuries would have resulted absent the alleged defect will be heavy in some instances and perhaps impossible in others. Where it is impossible, however, the plaintiff has merely failed to establish his prima facie case, *i. e.*, that it is more probable than not that the alleged defect aggravated or enhanced the injuries resulting from the initial collision. Moreover, in those instances in which the plaintiff cannot offer any evidence as to what would have occurred but for the alleged defect, the plaintiff has not established the fact of enhancement at all.

## VIII. Legal Effect of the Failure to Wear Seat Belts

■ The starting point of any discussion of the seat belt defense under New York law is *Spier v. Barker, supra*. *Spier* was a negligence action brought when (as at the time of the accident in the instant action) New York was a contributory negligence jurisdiction. The New York Court of Appeals ruled that a plaintiff's nonuse of seat belts may be considered only in determining damages and that failure to use a seat belt constitutes neither contributory negligence *per se* nor contributory negligence as a matter of common law. 35 N.Y.2d at 450–51, 323 N.E.2d at 167–68, 363 N.Y.S.2d at 921. The court noted that "the doctrine of contributory negligence is applicable only if the plaintiff's failure to exercise due care causes, in whole or in part, *the accident*, rather than when it merely exacerbates or enhances the severity of his injuries," *id.* at 451, 323 N.E.2d at 168, 363 N.Y.S.2d at 921 (emphasis in original), and added the caveat that "[n]ot involved in this case, and not considered, is an issue in which the failure to wear a seat belt is an alleged cause of the accident." *Id.* n.3.

VWAG urges us to carve out an exception to the *Spier* "mitigation rule" for second collision cases. It argues that (1) *Spier* does not apply to strict products liability claims; and (2) this is the exceptional case in which nonuse of the seat belt causes the accident. We disagree with both of these positions.

The doctrine of strict products liability in New York dates from *Codling v. Paglia*, 32 N.Y.2d 330, 298 N.E.2d 622, 345 N.Y.S.2d 461 (1973). *See Bolm v. Triumph Corp., supra*, 33 N.Y.2d at 159–60, 305 N.E.2d at 773, 350 N.Y.S.2d at 650. *Codling* provides:

> [U]nder a doctrine of strict products liability, the manufacturer of a defective product is liable to any person injured or damaged if the defect was a substantial factor in bringing about his injury or damages; provided: (1) that at the time of the occurrence the product is being

used (whether by the person injured or damaged or by a third person) for the purpose and in the manner normally intended, (2) that if the person injured or damaged is himself the user of the product he would not by the exercise of reasonable care have both discovered the defect and perceived its danger, and (3) that by the exercise of reasonable care the person injured or damaged would not otherwise have averted his injury or damages.

32 N.Y.2d at 342, 298 N.E.2d at 628–29, 345 N.Y.S.2d at 469–70.

VWAG maintains that the Caiazzos' failure to use their seat belts constitutes a failure to exercise reasonable care, which, in turn, bars them from recovery under part (3) of the *Codling* test. New York courts have uniformly interpreted the "exercise of reasonable care" language to be identical to that used for the doctrine of contributory negligence. *See, e. g., Bolm v. Triumph Corp.,* 71 A.D.2d 429, 434, 422 N.Y. S.2d 969, 973 (4th Dep't 1979). There is nothing in *Spier v. Barker, supra,* decided after both *Codling* and *Bolm,* that indicates that the *Spier* mitigation rule would not be applicable to a second collision products liability case.

Moreover, there is nothing in *Spier* to support VWAG's alternative argument that this is a case in which the failure to wear seat belts causes the accident. *See Spier, supra,* 35 N.Y.2d at 451, 323 N.E.2d at 168, 363 N.Y.S.2d at 921. VWAG argues that, as to them, "the accident" is the Caiazzos' ejection from the van. The "accident" quite simply is the collision between the two vehicles. VWAG, of course, is liable only for the injuries resulting from the defective door latch, which were certainly enhanced by the ejection. As Judge Dooling correctly instructed the jury, to the extent that VWAG establishes that the enhancement would not have occurred if plaintiffs had worn seat belts, the extent of

any recovery against it must be diminished accordingly.

## IX. Issues on Retrial

For the reasons already set forth, the case must be remanded for a new trial. The use of the special interrogatories at the first trial, however, obviates the need for an entire new trial and permits the second trial to be limited to the damages issue.

Specifically, the jury determined at the first trial that only the door latch assembly was defectively designed and that the Caiazzos were ejected and were not wearing seat belts. These issues need not be retried.

The Caiazzos will be required to establish the extent of enhanced injuries attributable to the defective design. This issue will be less complicated at the second trial, since the factual dispute as to what actually occurred during the accident has already been resolved.[17] VWAG will have the burden of establishing what injuries would have been obviated had the Caiazzos been wearing their seat belts.

Special interrogatories should be put to the jury to determine whether the Caiazzos would have incurred some injuries from the opening of the doors even if plaintiffs-appellees had been wearing seat belts. If the jury answers in the affirmative, the Caiazzos have established enhancement. The jury should then be instructed to apportion the Caiazzos' injuries among those caused by the collision, those caused by the defective door latch assembly, and those caused by the nonuse of seat belts. The extent to which liability should be reduced by the Caiazzos' negligence (in not wearing seat belts) should be appraised separately for Valentine and for VWAG.[18]

Affirmed in part, reversed in part, and remanded for proceedings consistent with this opinion.

---

**17.** Considering the confusion inherent in second collision cases, it might have been safer to charge and submit interrogatories on the causation issue separately from the charge and interrogatories on the segregation of damages.

**18.** *See* note 9 *supra.*

MANSFIELD, Circuit Judge (concurring):

In concurring in Judge Goettel's carefully considered and well-reasoned opinion, I wish to note in response to Judge Newman's dissent that as far as I am concerned it has not disregarded any relevant New York court decisions cited by the late Judge Dooling and it represents as reasonable a prediction of how New York courts would decide the issue before us as can be made under the circumstances.

In my view the dissent is premised on the erroneous assumption that the plaintiffs here were "non-negligent" and that their injuries are attributable solely to joint negligence on the part of the two defendants. However, the plaintiffs here were at fault for not having seat-belted themselves, which caused a substantial part of their injuries. Had they belted themselves they might well have avoided any injuries from the negligent door-latch design charged against VWAG. Indeed, had VWAG's negligence been charged as the sole cause of plaintiff's injuries, plaintiffs' own contributory negligence would have precluded any recovery against VWAG under New York law as it stood at the time of the accident. Plaintiffs are saved from dismissal only because of our adherence to the ruling of the New York Court of Appeals in *Spier v. Barker*, 35 N.Y.2d 444, 451, 363 N.Y.S.2d 916, 921, 323 N.E.2d 164, 168 (1974). "Traditional rules of negligence" have not therefore been misapplied.

NEWMAN, Circuit Judge (concurring in part and dissenting in part):

I agree with all aspects of the majority's opinion except the imposition upon the plaintiffs of the burden of proving the extent of their enhanced injuries attributable to the design defect for which defendant Volkswagenwerk Aktiengesellschaft (VW AG) is responsible. The majority acknowledges that our task in this diversity case is to predict how the New York courts would rule on the issues before us. How-

ever, in resolving the burden of proof question in part VII of the Court's opinion, the majority makes no mention of the New York cases[1] relied upon in the carefully considered opinion of the late Judge Dooling, who was the trial judge in this case. *See Caiazzo v. Volkswagenwerk, A.G.*, 468 F.Supp. 593, 602, 604 (E.D.N.Y.1979). Instead the majority selects the rule adopted by a divided panel of the Third Circuit in its effort to predict the course of New Jersey law, *Huddell v. Levin*, 537 F.2d 726 (3d Cir. 1976).

In its leading decision recognizing that an automobile manufacturer may be found liable for injuries caused by latent design defects, even though the defects were not the initiating cause of the accident, *Bolm v. Triumph Corp.*, 33 N.Y.2d 151, 305 N.E.2d 769, 350 N.Y.S.2d 644 (1973), the New York Court of Appeals opted in favor of "traditional rules of negligence." *Id.* at 159, 305 N.E.2d at 774, 350 N.Y.S.2d at 651. As the majority here points out, that statement was made in the context of determining whether the manufacturer may be found liable. However, there is not a hint in the *Bolm* opinion that traditional rules of negligence are not applicable to any of the other issues in a so-called "second collision" case, including the burden of proof as to apportionment of damages for which the second tort-feasor is liable.

The traditional rule is set forth in the Restatement (Second) of Torts § 433(B)(2) (1965): "Where the tortious conduct of two or more actors has combined to bring about harm to the plaintiff, and one or more of the actors seeks to limit his liability on the ground that the harm is capable of apportionment among them, the burden of proof as to the apportionment is upon each such actor." A New York trial judge, confronted with the issue that faced Judge Dooling, would very likely have instructed the jury according to the following language contained in 1 New York Pattern Jury Instructions § 2:307 (2d ed. 1974):

before by first motorist liable for entire damages), *aff'd*, 281 N.Y. 808, 24 N.E.2d 484 (1939).

---

1. *See* particularly, *Hawkes v. Goll*, 256 A.D. 940, 9 N.Y.S.2d 924 (2d Dep't) (second motorist who ran over plaintiff struck minutes

If you find ... that both defendants caused plaintiff's injuries but that, because of the nature of the accident and the nearness in time of the negligent acts and resulting injuries and the lack of opportunity to ascertain precisely which injuries were caused by the respective defendants, you cannot determine which of the plaintiff's injuries were caused by the respective defendants, both defendants will be liable for all the injuries plaintiff received and you will award only one verdict against both defendants.

Since this instruction places upon all of the defendants the risk that the evidence does not permit ascertainment of "precisely which injuries were caused by the respective defendants," it seems evident that it is up to the defendant who seeks to limit his liability to some portion of the damages to persuade the jury that a limitation is appropriate. No doubt this rule assigns VWAG a difficult task, to which Judge Learned Hand long ago replied, "He is a wrongdoer; let him unravel the casuistries resulting from his wrong." *Navigazione Libera Triestina S.A. v. Newton Creek Towing Co.*, 98 F.2d 694, 697 (2d Cir. 1938).

In *Huddell* the majority rejected the force of the authorities that place the burden of limiting damage liability upon the defendant by pointing out that many of them dealt with concurrent causes of a single injury. *Huddell v. Levin, supra,* 537 F.2d at 738. In such cases, assigning the burden of proof to the defendants is especially important to avoid the risk that the plaintiff, though establishing the negligence of both defendants, is left without remedy against either because he cannot prove which defendant caused his injury. Our case concerns causes closely related in time (the initial collision caused by Valentine's negligent operation of his car and the subsequent opening of the door latches caused by VWAG's negligent design) under

circumstances where the second cause was responsible for less than the total injuries. That is precisely the situation described in Illustration 6 to § 433B of the Restatement, in which a second tort-feasor, aggravating injuries initially caused by a first tort-feasor, was entitled to limit his liability only if he proved the portion of damages for which he was responsible. In such situations, it is true that leaving the burden upon the plaintiff to prove which of his injuries were caused by the second tort-feasor does not risk denial of all recovery, since the first tort-feasor is liable for all reasonably foreseeable injuries (including those enhanced by the second tort-feasor). But the fact that the argument for shifting the burden of apportionment to the second tort-feasor is not as forceful as in the situation where the plaintiff may be denied all recovery simply distinguishes a case of the sort that confronted the *Huddell* court; it does not help to resolve the issue as to which side bears the burden of proof.

However the issue may be decided elsewhere, *compare Huddell with Fox v. Ford Motor Co.*, 575 F.2d 774, 787 (10th Cir. 1978), *and Chrysler Corp. v. Todorovich*, 580 P.2d 1123, 1131 (Wyo.1978), our concern is how New York courts would rule. That is the question Judge Dooling considered, and I find nothing in the majority's opinion to indicate that he erred in answering it. The majority rejects Judge Dooling's answer,[2] not with citation of any contrary New York authority, but only with an expression of concern that placing the burden of apportionment on the second tort-feasor permits "undue speculation" by the jury and lets the jury resolve its uncertainties by "assigning responsibility to the defendant most able to pay a plaintiff's award." *Supra* at 250–51. But the majority's rule concerning the burden of proof does nothing to lessen jury speculation. Any jury asked to determine what the injuries would have been if one of the contributing causes had not been

2. In placing the burden upon VWAG to persuade the jury as to the portion of the plaintiffs' injuries for which it was not responsible, Judge Dooling first required the plaintiffs to establish the fact of enhanced injury, *i. e.,* that VWAG was responsible for some aggravation of damage. On reflection he concluded that this charge was too generous to VWAG and that plaintiffs should have been required to prove only that the VWAG design defect was a proximate cause of some of plaintiffs' injuries. 468 F.Supp. at 601.

present faces a task of considerable uncertainty, regardless of whether the burden of apportioning damage is placed upon the second tort-feasor or the plaintiff. Nor is the issue dependent upon whether the jury is inclined to find against the party better able to pay. If the jury were so inclined, it would not be deterred by an instruction placing the burden of proof upon the plaintiff.[3] Once a case presents a fair jury question, as all agree this case does, selection of a burden of proof rule requires a choice as to which party should be assigned the risk of loss in the event that the uncertainties in the evidence make it difficult to say that the fact in dispute is more likely so than not so. The choice is between the non-negligent[4] plaintiff who suffered injuries and the negligent defendant who caused at least some of them. Or, in terms of this case, the choice is between the plaintiffs, who were unfortunate enough to have been injured by the combined negligence of two defendants, and defendant VWAG, who was unfortunate enough to have its latent defect involved in an accident initially precipitated by defendant Valentine. When the nature of the events creates uncertainty as to which share of the injuries was caused by a particular defendant, the burden of apportionment should be on that defendant. In any event, I think Judge Dooling was right that New York courts would so rule.

If the majority's concern is that the jury's assessment of ⅔ of the damages against VWAG is too high and that the reduction of 25% for non-use of seat belts is too low, the appropriate remedy need not be a new trial on damages with the apportionment burden placed on the plaintiff. Instead, the burden of proof should be left on VWAG to limit its liability, and if the jury's verdicts are against the weight of the evidence, as the majority suggests, *supra* at 249, the order for a new trial on damages should be conditioned on the plaintiffs' refusal to accept a remittitur adjusting both VWAG's share of damages and the reduction for non-use of seat belts to appropriate percentages.[5]

---

**3.** In this respect, rules concerning burdens of proof are like canons of ethics. The latter, it has been observed, are not designed for the "bad man" inclined to cut corners but for the "good man" who seeks guidance in an uncertain area. *See General Motors Corp. v. City of New York*, 501 F.2d 639, 649 (2d Cir. 1974). The willful jury will simply invade the deep pocket. A burden of proof rule is not designed to protect that deep pocket, but to offer guidance to the conscientious jury, whose members are faithfully endeavoring to follow the judge's charge. If the evidence is really evenly balanced, that jury will find against whichever party is assigned the burden of proof.

**4.** The fact that the plaintiffs did not wear seat belts does not make them contributorily negligent under New York law, *Spier v. Barker*, 35 N.Y.2d 444, 363 N.Y.S.2d 916, 323 N.E.2d 164 (1974), although it is a circumstance the jury may consider in determining recoverable damages. Under *Spier* the amounts for which both defendants are liable are to be reduced by a percentage reflecting the extent to which the injuries would not have occurred if the plaintiffs had worn seat belts. All members of the panel agree that the burden of establishing this percentage was properly placed on the defendants. But if, as I believe, New York will follow the rule that obliges one of two tort-feasors to bear the burden of limiting his liability when the harm inflicted by each is capable of apportionment, then I find nothing in New York law to indicate that this burden of proof rule concerning apportionment should be altered simply because the plaintiffs may have their damage recovery reduced for not wearing seat belts.

**5.** The use of a remittitur in this diversity action is a matter of federal law. *West v. Jutras*, 456 F.2d 1222, 1225 n.6 (2d Cir. 1972); *Karlson v. 305 East 43rd Street Corp.*, 370 F.2d 467, 472 n.1 (2d Cir.), *cert. denied*, 387 U.S. 905, 87 S.Ct. 1690, 18 L.Ed.2d 625 (1967). We have followed the practice of setting a remittitur figure at a reasonable sum, *Lanfranconi v. Tidewater Oil Co.*, 376 F.2d 91 (2d Cir.), *cert. denied*, 389 U.S. 951, 88 S.Ct. 334, 19 L.Ed.2d 361 (1967), rather than at the highest or lowest figures supportable by the evidence. *See* 6A Moore's Federal Practice ¶ 59.05[3], at 58–59 (2d ed. 1979). In the absence of federal case law on whether a remittitur may adjust the figures for one of several defendants, New York law provides a helpful precedent. *Faulk v. Aware, Inc.*, 19 A.D.2d 464, 244 N.Y.S.2d 259 (1st Dep't 1963), *aff'd mem.*, 14 N.Y.2d 899, 200 N.E.2d 778, 252 N.Y.S.2d 95 (1964), *cert. denied*, 380 U.S. 916, 85 S.Ct. 900, 13 L.Ed.2d 801 (1965).