2010 UT 8

Jerad EGBERT and Emily Egbert, indi-
vidually and as guardians for Janessa
Egbert, Plaintiffs and Appellants,

v.

NISSAN MOTOR CO., LTD.,
Defendant and Appellee.

No. 20080993.

Supreme Court of Utah.

Feb. 19, 2010.

David C. Biggs, Kenneth D. Lougee, Salt Lake City, for appellants.

Tracy H. Fowler, Michael D. Zimmerman, Kamie F. Brown, Troy L. Booher, Salt Lake City, for appellee.

DURHAM, Chief Justice:

## INTRODUCTION

¶ 1 We have accepted certification of two questions from the United States District Court for the District of Utah: (1) is Utah Code section 78–15–6(3)[1] constitutional; and (2) does Utah recognize section 16(b)-(d) of the Restatement (Third) of Torts: Products Liability? We answer the first question in the affirmative and the second question in the negative.

## BACKGROUND

¶ 2 Because we previously answered two other certified questions in this case, we recite only those facts relevant to the questions now at issue. *See Egbert v. Nissan N. Am., Inc.,* 2007 UT 64, ¶¶ 2–6, 167 P.3d 1058 (*Egbert I* ).

¶ 3 Jerad and Emily Egbert were involved in a car accident. Trying to avoid another vehicle, Mr. Egbert lost control of his 1998 Nissan Altima, and the car rolled. During the accident, the front passenger window shattered. Mrs. Egbert, eight months pregnant at the time, was ejected through the window. She suffered serious injuries and had an emergency C-section. The couple's daughter, J.E., was born with a serious brain injury.

¶ 4 The Egberts brought products liability claims against Nissan. Specifically, they assert that the passenger window was defectively designed because it was made with tempered glass, which shatters on impact, and not laminated glass, which remains intact and acts as a secondary restraint mechanism. The Egberts argue that had the Altima's window been made of laminated glass, Mrs. Egbert would have remained in the car, her injuries would have been less severe, and J.E. would not have suffered a brain injury.

¶ 5 Nissan argues that the Altima was not defective because at the time the car was manufactured, the tempered glass window met the applicable federal safety standards. Nissan further claims that the glass was not the proximate cause of Mrs. Egbert's or J.E.'s injuries and that Mrs. Egbert would have been ejected from the Altima even if the window had been made of laminated glass.

¶ 6 In *Egbert I,* this court answered two other certified questions. First, we held that "the jury should be instructed that the presumption [of nondefectiveness] established by Utah Code section 78–15–6(3) has arisen and that a preponderance of the evidence is sufficient to rebut it." *Id.* ¶ 1. Second, the court held that Utah recognizes the " 'enhanced injury' theory of liability as outlined in section 16(a) of the Restatement (Third) of Torts." *Id.*

¶ 7 The federal district court subsequently determined that this court had not yet addressed the issues now before us, which are controlling in the case. Under Utah Rule of

---

1. In 2008, the Utah Legislature revised and recodified Title 78. The legislature moved the Utah Product Liability Act from sections 78–15–1 to –7 to sections 78B–6–701 to –707. It renumbered section 78–15–6 as section 78B–6–703. We refer to the previous numbering for clarity in our analysis and because this case was brought before the recodification.

Appellate Procedure 41, the federal district court certified the two questions to us, and we accepted the certification. We have original jurisdiction over this matter pursuant to Utah Code section 78A–3–102(1) (2008).

## STANDARD OF REVIEW

■ ¶ 8 A certified question presents a question of law, which we review for correctness "without 'resolving the underlying dispute.'" *Egbert I,* 2007 UT 64, ¶ 7, 167 P.3d 1058 (quoting *In re Kunz,* 2004 UT 71, ¶ 6, 99 P.3d 793).

## ANALYSIS

### I. UTAH CODE SECTION 78–15–6(3) IS CONSTITUTIONAL

¶ 9 The first question certified to us is whether Utah Code section 78–15–6(3) is constitutional. This question stems from a decision made by this court in 1985 and the legislature's subsequent response. In *Egbert I,* we raised a concern as to the constitutionality of section 78–15–6(3), but we did not address the issue as it fell outside the scope of the question certified to us. 2007 UT 64, ¶ 8 n. 3, 167 P.3d 1058.

¶ 10 The Egberts assert that section 78–15–6 is unconstitutional and that to hold otherwise would be a violation of the Utah Constitution's provisions regarding enactment of legislation. They reference *Berry v. Beech Aircraft Corp.,* 717 P.2d 670 (Utah 1985), where we addressed the constitutionality of the Utah Product Liability Act. Specifically, we examined Utah Code section 78–15–3. *Id.* at 672. We held that section 78–15–3 was unconstitutional under the open courts provision of article I, section 11 of the Utah Constitution because it was a statute of repose which barred claims before the cause of action arose. *See id.* at 681–83. We also determined that because the legislature would not have enacted sections 78–15–4 to – 6 without section 78–15–3, the Act was nonseverable. *Id.* at 686. We therefore held that sections 78–15–4 to –6 were also unconstitutional. *Id.* at 685–86.

¶ 11 In 1989, the legislature enacted a new section 78–15–3. In doing so, it changed the statute of repose to a statute of limitations. Act of Feb. 20, 1989, ch. 119, § 1, 1989 Utah Laws 268; Utah Code Ann. § 78–15–3 (Supp. 1990). This change resolved the constitutional problems dealt with in *Berry. See Egbert I,* 2007 UT 64, ¶ 8 n. 3, 167 P.3d 1058. The legislature, however, took no action regarding section 78–15–6. *See id.* Because it did not, the Egberts argue that section 78–15–6 remains void. Although this would generally be the consequence of the legislature's failure to reenact the nonseverable parts of the statute, subsequent actions by the legislature and this court require a different conclusion.

■ ¶ 12 When a court declares a statute unconstitutional, the statute becomes void. "An unconstitutional act is not a law; it confers no rights; it imposes no duties; it affords no protection; it creates no office; it is, in legal contemplation, as inoperative as though it had never been passed." *Norton v. Shelby County,* 118 U.S. 425, 442, 6 S.Ct. 1121, 30 L.Ed. 178 (1886); *see also Rossborough Mfg. Co. v. Trimble,* 301 F.3d 482, 491 (6th Cir.2002) ("[W]hen a statute is held to have been unconstitutional as of its enactment, that statute is void *ab initio.*"); *In the Interest of R.A.S.,* 249 Ga. 236, 290 S.E.2d 34, 35 (1982) ("[O]nce a statute is declared unconstitutional and void, it cannot be saved by a subsequent statutory amendment, as there is, in legal contemplation, nothing to amend."); *Reyes v. Texas,* 753 S.W.2d 382, 383 (Tex.Crim.App.1988) ("It is the general rule that an unconstitutional statute, even though having the form and name of law, in reality is no law and in legal contemplation is as inoperative as if it had never undergone the formalities of enactment. Such a statute leaves the question that it purports to settle just as it was prior to its ineffectual enactment." (internal quotation marks omitted)). Hence, "[a] statute once held void cannot be revived by repeal and reenactment." 82 C.J.S. *Statutes* § 300 (1999). And "[w]here a statute is unconstitutional and void when enacted, the subsequent removal of the constitutional objections thereto does not, by operation of law, give it force and effect." *Id.*

¶ 13 Undoubtedly, this court's ruling in *Berry* declared section 78–15–6 to be unconstitutional. With that declaration, section

78–15–6 became void. Nissan, however, argues that by curing the constitutional defect of section 78–15–3 and reenacting section 78–15–3, the legislature made the nonseverable sections of the statutory scheme valid once more.[2] While this theory of implied validation has been adopted elsewhere, we reject its application in this context.

¶ 14 Under the theory of implied validation, "[t]he legislature, by repeatedly recognizing a law that is invalid for failure to comply with certain constitutional requirements as to form and procedure, may ratify it and make it valid." 82 C.J.S. Statutes § 8 (1999). Implied validation, however, is generally used to "validate an invalid statute by passing a constitutional amendment" that cures the constitutional infirmity. *Id.; see also Beck v. Beck*, 814 S.W.2d 745, 747 (Tex. 1991) (explaining the doctrine of implied validation). This occurs in one of three ways. The first is by a specific provision in the amendment that shows "expressly or by necessary implication that [the amendment] was intended to operate retrospectively by validating antecedent unconstitutional legislation." 16 C.J.S. *Constitutional Law* § 87 (2005); *see, e.g., Bonds v. State Dep't of Revenue*, 254 Ala. 553, 49 So.2d 280, 281–82 (1950) (ruling a void act was validated by a subsequent constitutional amendment, which expressly validated and confirmed the void act). The second occurs where a legislature enacts a statute in anticipation of an amendment and the legislature "prescrib[es] the manner of giving effect to [the] amendment[ ]." 16 C.J.S. *Constitutional Law* § 88 (2005); *see also Burrell v. Miss. State Tax Comm'n*, 536 So.2d 848, 860 (Miss.1988). The third happens when a statute is enacted in anticipation of a constitutional amendment and the statute and amendment are "debated and considered together in the same session of the legislature." *Ex parte S. Ry. Co.*, 556 So.2d 1082, 1090 (Ala.1989).

¶ 15 Although the situation here is arguably analogous, it does not involve a constitutional amendment. Moreover, even if it were advisable to extend the theory of implied validation in a purely statutory context, the theory would not work here. We recognize that Senate Bill 25, the bill leading to the enactment of section 78–15–3, referred to section 78–15–5, which was one of the sections we found unconstitutional in *Berry*. Yet, neither the bill nor the statute mentioned section 78–15–6. Also, we have not been directed toward anything that shows the legislature passed section 78–15–3 to cure section 78–15–6. Moreover, we are not convinced that validation should be permitted by implication. As the problem before us illustrates, reliance on implication in law-making causes confusion. When the question arises whether a law is a law, we think it best, and mandatory under the constitution, that the legislature give clear notice of its law-making intent by following the constitutional provisions established for the passage of law. This method is simple, and its consequence is clear. Accordingly, we reject Nissan's argument that the cured statute of limitations in section 78–15–3 impliedly validated section 78–15–6. If a law struck down is to become constitutional once more, the legislature must cure the constitutional defect and enact the law in accordance with the legislative process.

¶ 16 Although we reject Nissan's theory of implied validation, we acknowledge that there has been an assumption of section 78–15–6's constitutionality for roughly twenty years, an assumption that we conclude has become in essence a common law rule. "The common law ... includes those rules of law which do not rest for their authority upon any express or positive statute or other written declaration, but rather upon statements of principles found in the decisions of the courts." 15A Am.Jur.2d *Common Law* § 1

---

2. Nissan also argues that the Egberts' focus on reenactment exceeds the scope of the certified question and thus we should only look to the narrow question of whether section 78–15–6(3) is constitutional. This argument is unavailing. This court has noted that it "will reformulate the question if necessary regardless of whether the federal court has expressly stated this in the

certification." *In re W. Side Prop. Assocs.*, 2000 UT 85, ¶ 13, 13 P.3d 168. Therefore, even if the question were limited to the narrow reading proposed by Nissan, we would reformulate the question to address the reenactment in order for our answer of the certified question to clarify the disputed issue of law and to assist the federal district court.

(2000). "[T]he common law is the rule of decision in cases not otherwise provided for by statute." *State v. Lawrence,* 98 Idaho 399, 565 P.2d 989, 990 (1977). "It is the law of necessity." *Metro. Life Ins. Co. v. Strnad,* 255 Kan. 657, 876 P.2d 1362, 1367 (1994).

¶ 17 Since *Berry,* Utah appellate courts have applied the rule previously codified in section 78–15–6 in thirteen cases.[3] The United States Court of Appeals for the Tenth Circuit and the United States District Court for the District of Utah have also applied the rule in at least seven cases.[4] We hold therefore that through two decades of judicial articulation, Utah courts have filled the void by adopting implicitly into the common law the same rule as that enunciated by section 78–15–6. We do so based on the length of time, the consistency of holdings, the continued reliance on the rule, and necessity. We note that if the rule itself were unconstitutional, there could be no adoption of it through common law, but that is not the case here.

¶ 18 In addition, though section 78–15–6 became a common law rule over a 20–year period, the legislature has recently recodified it as part of the statutory scheme. In 2008, the legislature recodified and revised Title 78 of the Utah Code. It specifically renumbered and recodified section 78–15–6 as section 78B–6–703. The Egberts argue that this recodification was purely administrative and cannot qualify as legislative action. We disagree.

¶ 19 "A revision or codification of statutes is something more than a restatement of the substance thereof.... It implies a reexamination of them ... in a corrected improved form." 82 C.J.S. *Statutes* § 266 (1999). Unlike a compilation, a revision and recodification requires legislative action. *See id.* Through this legislative action, the legislature "enacts, and makes of force as a statute, every provision in the entire work which it has under consideration, whether or not such provisions had been previously enacted by the legislature." *Id.* § 270.

¶ 20 Here, the legislature passed House Bill 78 for the Recodification and Revision of Title 78. In accordance with article VI, section 22 of the Utah Constitution, the legislature read the bill three separate times in each house before its passage. Moreover, not only did the legislature make stylistic changes to the statute, it also made a substantive change. The legislature deleted the statute's former section (2), which defined the phrase "unreasonably dangerous." *See* Title 78 Recodification & Revision, ch. 3, § 975, 2008 Utah Laws 475.[5] Accordingly, because of this recodification and revision, section 78–15–6 has now been fully enacted as required by the constitution.[6]

¶ 21 We therefore answer the federal district court's first certified question in the

---

**3.** *See Egbert I,* 2007 UT 64, 167 P.3d 1058; *438 Main St. v. Easy Heat, Inc.,* 2004 UT 72, 99 P.3d 801; *Alder v. Bayer Corp.,* 2002 UT 115, 61 P.3d 1068; *Slisze v. Stanley–Bostitch,* 1999 UT 20, 979 P.2d 317; *Lamb v. B & B Amusements Corp.,* 869 P.2d 926 (Utah 1993); *Nay v. Gen. Motors Corp.,* 850 P.2d 1260 (Utah 1993); *Grundberg v. Upjohn Co.,* 813 P.2d 89 (Utah 1991); *Yirak v. Dan's Super Mkts., Inc.,* 2008 UT App 210, 188 P.3d 487; *Dimick v. OHC Liquidation Trust,* 2007 UT App 73, 157 P.3d 347; *House v. Armour of Am., Inc.,* 886 P.2d 542 (Utah Ct.App.1994); *Burns v. Cannondale Bicycle Co.,* 876 P.2d 415 (Utah Ct. App.1994); *Maack v. Res. Design & Constr., Inc.,* 875 P.2d 570 (Utah Ct.App.1994)(overruled on other grounds by *Davencourt at Pilgrims Landing Homeowners Ass'n v. Davencourt at Pilgrims Landing, LC,* 2009 UT 65, 221 P.3d 234); *Kleinert v. Kimball Elevator Co.,* 854 P.2d 1025 (Utah Ct.App.1993).

**4.** *See Henrie v. Northrop Grumman Corp.,* 502 F.3d 1228 (10th Cir.2007); *Brown v. Sears, Roe-*

*buck & Co.,* 328 F.3d 1274 (10th Cir.2003); *Taylor v. Cooper Tire & Rubber Co.,* 130 F.3d 1395 (10th Cir.1997); *Ontiveors v. Danek Med., Inc.,* Case No. 2:95CV01135C, 1999 WL 1129651, 1999 U.S. Dist. LEXIS 18873 (D.Utah Aug.3, 1999); *Salt Lake City Corp. v. Kasler Corp.,* 855 F.Supp. 1560 (D.Utah 1994); *Ghionis v. Deer Valley Resort Co.,* 839 F.Supp. 789 (D.Utah 1993); *Allen v. Minnstar,* Case No. 86–C–1074–S, 1989 WL 434765, 1989 U.S. Dist. LEXIS 18395 (D.Utah Nov. 20, 1989).

**5.** The definition of "unreasonably dangerous" is now located at Utah Code section 78B–6–702.

**6.** Of course, if the legislature were to reenact or revise and recodify a statute ruled unconstitutional and the constitutional defect remained within the statute, that statute would still be void. Such is not the case here because the legislature resolved the constitutional defect by changing the statute of repose to a statute of limitations.

affirmative. Section 78–15–6 of the Utah Code became constitutional following the 2008 recodification by the legislature. For cases filed after *Berry* but before the 2008 recodification, section 78–15–6 was not statutory law, but the rule contained therein was in force as part of the common law.

## II. UTAH DOES NOT RECOGNIZE SECTION 16(B)-(D) OF THE RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY

¶ 22 The second question certified to us is whether Utah recognizes section 16(b)-(d) of the Restatement (Third) of Torts: Products Liability. The answer is no.

¶ 23 Section 16 of the Restatement (Third) of Torts addresses an enhanced injury claim—sometimes known as a crashworthiness or second collision claim—in the products liability context. An enhanced injury occurs when an injury caused by some other event is increased or enhanced due to a defective product. *See Larsen v. Gen. Motors Corp.*, 391 F.2d 495, 503 (8th Cir.1968) ("Any design defect not causing the accident would not subject the manufacturer to liability for the entire damage, but the manufacturer should be liable for that portion of the damage or injury caused by the defective design over and above the damage or injury that probably would have occurred as a result of the impact or collision absent the defective design.") In *Egbert I*, we held that Utah recognizes the theory of liability for an enhanced injury as outlined in subsection 16(a) of the Restatement. 2007 UT 64, ¶ 18, 167 P.3d 1058. However, we did not address the remaining subsections because they fell outside the certified question. *See id.* ¶ 20. We do so now.

¶ 24 Subsections 16(b) through (d) of the Restatement address the burden of proof in an enhanced-injury case. The subsections read:

(b) If proof supports a determination of the harm that would have resulted from other causes in the absence of the product defect, the product seller's liability is limited to the increased harm attributable solely to the product defect.

(c) If proof does not support a determination under Subsection (b) of the harm that would have resulted in the absence of the product defect, the product seller is liable for all of the plaintiff's harm attributable to the defect and other causes.

(d) A seller of a defective product that is held liable for part of the harm suffered by the plaintiff under Subsection (b), or all of the harm suffered by the plaintiff under Subsection (c), is jointly and severally liable or severally liable with other parties who bear legal responsibility for causing the harm, determined by applicable rules of joint and several liability.

Restatement (Third) of Torts: Products Liability § 16(b)-(d) (1998).

¶ 25 The difficulty in the Restatement arises in subsection (c) for injuries thought to be indivisible or single. "An indivisible injury has been defined as one which is incapable of any logical, reasonable, or practical division." *Mitchell v. Volkswagenwerk, AG*, 669 F.2d 1199, 1203 n. 2 (8th Cir.1982) (internal quotation marks omitted). Some courts reason that in an enhanced-injury case, where two or more concurrent tortious acts caused an indivisible injury, such as death or paraplegia, apportionment of damages is inappropriate or impossible. *See Fox v. Ford Motor Co.*, 575 F.2d 774, 787 (10th Cir.1978). These courts thus face a dilemma: which party bears the burden to prove apportionment of an enhanced, indivisible injury? In an attempt to resolve this dilemma, two approaches have emerged.

### A. The Two Recognized Approaches to Proving Apportionment

¶ 26 The first approach to indivisible enhanced injuries, which the Egberts urge us to adopt and which the Restatement follows, is known as the *Fox–Mitchell* approach. *See Fox*, 575 F.2d 774; *Mitchell*, 669 F.2d 1199. The Egberts assert that if we adopt this approach, Utah will join a majority of courts.[7]

---

7. The Restatement claims that "a total of 23 states favor" the *Fox–Mitchell* approach. Re-

statement (Third) of Torts: Products Liability § 16 cmt. d (1998). However, this total includes

¶ 27 Under the *Fox–Mitchell* approach, as outlined in the Restatement, where an indivisible injury exists in an enhanced-injury case, a plaintiff need only show that the product defect was a substantial factor in increasing the plaintiff's harm beyond that which would have resulted from other causes. If the defect is found to be a substantial factor and the fact-finder cannot apportion liability for the indivisible injury, then the product seller [8] is jointly and severally liable with the other tortfeasors who caused the injury. *See Mitchell*, 669 F.2d at 1206; Restatement (Third) of Torts: Products Liability § 16(a)-(d) (1998). Consequently, once the plaintiff has established that the defect was a substantial factor, if the product seller seeks to avoid joint and several liability, it bears the burden of proving that the injury can be apportioned. *See* Restatement (Third) of Torts: Products Liability § 16 cmt. d (1998).

¶ 28 Proponents compare the *Fox–Mitchell* approach to a situation where two parties "cooperate in the production of an injury." *Fox*, 575 F.2d at 787; *accord* Restatement (Second) of Torts § 433B (1965). For them the injury flows from one impact caused by concurrent or contemporaneous tortfeasors. *See Fox*, 575 F.2d at 787. They also favor the approach for its public policy ramifications. Without the *Fox–Mitchell* approach, "a proven wrongdoer [would] escape liability when the harm [could not] be apportioned," and "a contrary rule would allow a [product seller] to escape liability even when a plaintiff had shown that the [product seller] had sold a defective product." *Gen. Motors Corp. v. Farnsworth*, 965 P.2d 1209, 1219 (Alaska 1998). It also "might impair the promotion of 'safer products' design[ed] by manufacturers." *Lee v. Volkswagen of Am., Inc.*, 688 P.2d 1283, 1288 (Okla.1984). Further, because the product seller has "extensive knowledge of the product and its technical resources," it "is in the best position to perform ... apportionment." *Farnsworth*, 965 P.2d at 1219.

¶ 29 The *Fox–Mitchell* approach has its critics. They prefer instead the *Huddell–Caiazzo* approach, followed by a minority of states.[9] *See Huddell v. Levin*, 537 F.2d 726 (3d Cir.1976); *Caiazzo v. Volkswagenwerk*

states that have not definitively or specifically addressed the issue. Subtracting these states, and taking into consideration states that have since adopted the approach or switched sides, it appears that a total of 21 states have adopted the *Fox–Mitchell* approach. *See Gen. Motors Corp. v. Edwards*, 482 So.2d 1176, 1189–91 (Ala.1985) *overruled on other grounds by Schwartz v. Volvo N. Am. Corp.*, 554 So.2d 927 (Ala.1989); *Gen. Motors Corp. v. Farnsworth*, 965 P.2d 1209, 1220 (Alaska 1998); *Czarnecki v. Volkswagen of Am.*, 172 Ariz. 408, 837 P.2d 1143, 1148 (Ct.App. 1991); *Doupnik v. Gen. Motors Corp.*, 225 Cal. App.3d 849, 275 Cal.Rptr. 715, 725–26 (1990); *Polston v. Boomershine Pontiac–GMC Truck, Inc.*, 262 Ga. 616, 423 S.E.2d 659, 662 (1992); *Fouche v. Chrysler Motors Corp.*, 107 Idaho 701, 692 P.2d 345, 348–49 (1984); *Oakes v. Gen. Motors Corp.*, 257 Ill.App.3d 10, 194 Ill.Dec. 844, 628 N.E.2d 341, 349 (1993); *Jahn v. Hyundai Motor Co.*, 773 N.W.2d 550, 559 (Iowa 2009); *Valk Mfg. Co. v. Rangaswamy*, 74 Md.App. 304, 537 A.2d 622, 633 (Ct.Spec.App.1988) *rev'd on other grounds by Montgomery County v. Valk. Mfg. Co.*, 317 Md. 185, 562 A.2d 1246 (1989); *Lally v. Volkswagen Aktiengesellschaft*, 45 Mass. App.Ct. 317, 698 N.E.2d 28, 38–39 (1998); *McDowell v. Kawasaki Motors Corp. USA*, 799 S.W.2d 854, 867 (Mo.Ct.App.1990); *Kudlacek v. Fiat S.p.A.*, 244 Neb. 822, 509 N.W.2d 603, 611–12 (1994); *Trull v. Volkswagen of Am., Inc.*, 145 N.H. 259, 761 A.2d 477, 482–83 (2000); *Poliseno v. Gen. Motors Corp.*, 328 N.J.Super. 41, 744 A.2d 679, 686 (Ct.App.Div.2000); *Pang v. Minch*, 53 Ohio St.3d 186, 559 N.E.2d 1313, 1324 (1990); *Lee v. Volkswagen of Am., Inc.*, 688 P.2d 1283, 1288 (Okla.1984); *Harsh v. Petroll*, 584 Pa. 606, 887 A.2d 209, 217–19 (2005); *Gen. Motors Corp. v. Castaneda*, 980 S.W.2d 777, 780–81 (Tex.Ct. App.1998); *Blankenship v. Gen. Motors Corp.*, 185 W.Va. 350, 406 S.E.2d 781, 786 (1991); *Maskrey v. Volkswagenwerk Aktiengesellschaft*, 125 Wis.2d 145, 370 N.W.2d 815, 821–22 (Ct. App.1985); *Chrysler Corp. v. Todorovich*, 580 P.2d 1123, 1130–31 (Wyo.1978).

8. Cases addressing enhanced injuries use the terms "product seller" and "product manufacturer" interchangeably. Because the Restatement uses the term "product seller," we do as well.

9. *Mazda Motor Corp. v. Lindahl*, 706 A.2d 526, 532 (Del.1998); *D'Amario v. Ford Motor Co.*, 806 So.2d 424, 437 (Fla.2001); *Toyota Motor Corp. v. Gregory*, 136 S.W.3d 35, 41–42 (Ky.2004); *Sumner v. Gen. Motors Corp.*, 212 Mich.App. 694, 538 N.W.2d 112, 115 (1995) *rev'd on other grounds by Lopez v. Gen. Motors Corp.*, 224 Mich.App. 618, 569 N.W.2d 861 (1997); *Duran v. Gen. Motors Corp.*, 101 N.M. 742, 688 P.2d 779, 787 (Ct.App. 1983) *rev'd on other grounds by Brooks v. Beech Aircraft Corp.*, 120 N.M. 372, 902 P.2d 54 (1995); *Garcia v. Rivera*, 160 A.D.2d 274, 553 N.Y.S.2d 378, 379–80 (N.Y.App.Div.1990).

*A.G.*, 647 F.2d 241 (2d Cir.1981). The *Huddell–Caiazzo* approach, which Nissan urges us to adopt, reasons that a product seller "is liable only for the enhanced injuries attributable to the defective product." *Huddell,* 537 F.2d at 738. Because this is "the essence of liability," the burden cannot properly shift to the defendant product seller to prove part of the plaintiff's case, nor can the failure to prove apportionment convert what was limited liability for the enhancement of an injury "into plenary liability for the entire consequences of an accident which the [product seller] played no part in precipitating." *Id.* at 738–39. This approach views the enhanced-injury case not as an injury arising from one single impact caused by contemporaneous tortfeasors; rather it separates the injury and the circumstances surrounding it into distinct, disparate events. *See id.* at 738; *see also D'Amario v. Ford Motor Co.,* 806 So.2d 424, 437 (Fla.2001) ("[C]rashworthiness cases involve separate and distinct injuries-those caused by the initial collision, and those subsequently caused by a second collision arising from a defective product.").

¶ 30 Hence, under the *Huddell–Caiazzo* approach, for a plaintiff to recover against a product seller for an enhanced injury, the plaintiff must "establish the extent of enhanced injuries attributable to the defective design." *Caiazzo,* 647 F.2d at 246. When an indivisible injury exists, a plaintiff must demonstrate with specificity "what might have happened in the collision under different circumstances." *Id.* at 245. Although a shifting burden of proof would "corner[ ] the [product seller] into offering evidence of a plethora of hypothetical and speculative possibilities," *id.* at 246, the *Huddell–Caiazzo* approach recognizes that "a plaintiff's burden

of offering evidence of what injuries would have resulted absent the alleged defect will be heavy in some instances and perhaps impossible in others." *Id.* at 251. Where the task is impossible, the approach reasons that "the plaintiff has merely failed to establish his prima facie case" of an enhanced injury. *Id.*

### B. *Abolition of Joint and Several Liability Requires a New Approach*

¶ 31 "Although both the *Fox–Mitchell* approach and the *Huddell[-Caiazzo]* approach are logically defensible," *Farnsworth,* 965 P.2d at 1220, we decline to adopt either because they do not adequately address the difficulties faced by states that have abolished joint and several liability, as Utah has. *See* Utah Code Ann. § 78B–5–818(3) (2008).

¶ 32 The Restatement itself is silent on the problem. Despite recognizing a growing trend away from joint and several liability, the Restatement offers no guidance. It merely states, "In many jurisdictions, the common-law rules of joint and several liability have undergone significant legislative modification limiting liability to the percentage of fault allocated to each party." Restatement (Third) of Torts: Products Liability § 16 cmt. e (1998). The Restatement thus offers no guidance in determining how to deal with indivisible injuries where joint and several liability is unavailable. Most of the states that have adopted the *Fox–Mitchell* approach have retained joint and several liability in at least some form.[10] Only five states that have adopted the *Fox–Mitchell* approach have abolished joint and several liability in this context,[11] and none of them

---

10. *See Matkin v. Smith,* 643 So.2d 949, 951 (Ala. 1994); Cal. Civ.Code § 1431.2 (West 2007); 735 Ill. Comp. Stat. 5/2–1117 (2009); Iowa Code § 668.4 (2008); *Consumer Prot. Div. v. Morgan,* 387 Md. 125, 874 A.2d 919, 946 (2005); Mass. Gen. Laws. Ch. 231B, § 1 (2009); Mo.Rev.Stat. § 537.067 (2000); Neb.Rev.Stat. § 25–21, 185.10 (1995); N.H.Rev.Stat. Ann. § 507:7–e (1997); N.J. Stat. Ann. § 2A:15–5.3 (West 2009); Ohio Rev.Code Ann. § 2307.22 (LexisNexis 2009); Okla. Stat. tit. 23, § 15 (2009); 42 Pa. Cons.Stat. § 7102 (2009); Tex. Civ. Prac. & Rem.Code Ann. § 33.013 (Vernon 2009); W. Va.Code § 55–7–24 (2009); Wis. Stat. § 895.045(1) (2008).

11. Of this group, only three states have entirely abolished joint and several liability. *See* Alaska Stat. § 09.17.080 (2009); Ga.Code Ann. § 51–12–33 (2009); Wyo. Stat. Ann. § 1–1–109 (2009). Also, although Arizona and Idaho permit joint and several liability in some circumstances, both states have abolished joint and several liability in personal injury cases. *See* Ariz.Rev.Stat. Ann. § 12–2506 (2009); Idaho Code Ann. § 6–803 (2004).

have yet addressed or explained the viability of the approach in its absence.[12]

¶ 33 Nissan argues that the *Huddell–Caiazzo* approach resolves our problem. We disagree. The *Huddell–Caiazzo* approach actually was first articulated prior to the emergence of the *Fox–Mitchell* line of cases and therefore did not arise in the context of the more contemporary trend away from joint and several liability. One-half of the states adopting the *Huddell–Caiazzo* approach are states that have retained joint and several liability in some form.[13] Only Florida, Kentucky, and Michigan have abolished joint and several liability in this context.[14] Yet in adopting the *Huddell–Caiazzo* approach, neither the Kentucky Supreme Court nor the Michigan Court of Appeals mentioned the problem. *See Toyota Motor Corp. v. Gregory*, 136 S.W.3d 35, 41–42 (Ky. 2004); *Sumner v. Gen. Motors Corp.*, 212 Mich.App. 694, 538 N.W.2d 112, 114–15 (1995) *rev'd on other grounds by Lopez v. Gen. Motors Corp.*, 224 Mich.App. 618, 569 N.W.2d 861 (1997). Likewise, the Florida Supreme Court did not mention the problem. Although the court referenced the statute which abolished joint and several liability, it chose to ignore the statute by holding that it did "not ordinarily apply in crashworthiness or enhanced injury cases." *D'Amario*, 806

So.2d at 426, 435.[15] Furthermore, we can find no court that has adopted the minority approach with an explicit acknowledgment or any discussion of its state's abolition of joint and several liability.

¶ 34 We are concerned that the *Huddell–Caiazzo* approach could result in complete non-recovery for plaintiffs, even where defective products have certainly contributed to their injuries. The approach claims that even if plaintiffs fail to meet their burden to apportion damages between an original tortfeasor and a product seller, they may still recover from the original tortfeasor, who remains liable for all damages. *See Huddell*, 537 F.2d at 739 ("Should plaintiff fail to meet her burden on this claim, the brute fact is that the negligent driver would *not* escape liability on the same ground.") (emphasis in original). This result is not permitted under Utah's liability regime, where the liability of any given defendant is limited to only that proportion of fault attributed to that defendant. If there can be no apportionment for an indivisible injury, then the original tortfeasor can be no more liable than the product seller. Thus, under the *Huddell–Caiazzo* approach, if apportionment is impossible, both defendants "walk," leaving the injured plaintiff to suffer the loss alone.

**12.** In Alaska, although the statute abolishing joint and several liability precedes the supreme court's decision by roughly ten years, the court made no mention of the statutory mandate, and it has not since commented on this inherent conflict. *See Farnsworth*, 965 P.2d at 1218–20. Similarly, although the Arizona Legislature enacted section 12–2506 in 1987, *see Church v. Rawson Drug & Sundry Co.*, 173 Ariz. 342, 842 P.2d 1355, 1358 (Ct.App.1992), the Arizona Court of Appeals made no mention of the statute and instead relied upon a "single injury" rule created by the Arizona Supreme Court in 1966. *See Czarnecki*, 837 P.2d at 1146 (citing *Holtz v. Holder*, 101 Ariz. 247, 418 P.2d 584, 587–88 (1966)). No Arizona court has yet addressed the inherent conflict. In the remaining three states, Georgia, Idaho, and Wyoming, the judicial decisions predate the state legislature's abolition or limitation of joint and several liability. In Georgia, the legislature abolished joint and several liability in 2005, more than a decade after the Georgia Supreme Court decided *Polston*, 262 Ga. 616, 423 S.E.2d 659. The Idaho Legislature severely limited joint and several liability in 1987, roughly three years after the Idaho Supreme Court decided *Fouche*, 107 Idaho 701,

692 P.2d 345. Likewise, the Wyoming Supreme Court decided *Todorovich*, 580 P.2d 1123, eight years before its legislature enacted a 1986 amendment that abolished joint and several liability. None of these state courts have yet addressed the conflict.

**13.** *See* Del.Code Ann. tit. 10, § 6301 (1999); N.M. Stat. § 41–3A–1 (1996); N.Y. C.P.L.R. 1601 (McKinney 2009).

**14.** *See* Fla. Stat. § 768.81 (2009); Ky.Rev.Stat. Ann. § 411.182 (LexisNexis 2005); Mich. Comp. Laws § 600.6304 (2009).

**15.** In *D'Amario*, the Florida Supreme Court considered companion cases involving the single injury of death. The first death occurred after a car "collided with a tree and then burst into flames," and the second death happened in a crash when the victim's "head struck the metal post that separates the windshield from the driver's door." 806 So.2d at 428, 429. Despite these single injuries, the court reasoned that such cases "involve separate and distinct injuries." *Id.* at 437.

¶ 35 We therefore reject both the *Fox–Mitchell* and the *Huddell–Caiazzo* approaches and look instead to a rule based on party apportionment, the predicate for Utah's liability scheme. In doing so, we look to the statute that abolished joint and several liability. Section 78B–5–818(3) of the Utah Code provides, "No defendant is liable to any person seeking recovery for any amount in excess of the proportion of fault attributed to that defendant...." Section 78B–5–817 defines "fault" broadly. It states,

> "Fault" means any actionable breach of legal duty, act, or omission proximately causing or contributing to injury or damages sustained by a person seeking recovery, including negligence in all its degrees, comparative negligence, assumption of risk, strict liability, breach of express or implied warranty of a product, products liability, and misuse, modification, or abuse of a product.

*Id.* § 78B–5–817(2).

■ ¶ 36 Unlike both approaches advocated by the parties, which reason that some enhanced injuries cannot be apportioned, Utah's statute contains an explicit legislative intent and declaration that fault, in all its broadly defined forms, is *always* apportionable. Thus, even when a plaintiff suffers what is generally thought to be an indivisible injury, our statute calls for apportionment.

■ ¶ 37 This statutory demand for apportionment does not necessarily lead to pure speculation by fact-finders. This court has ruled that "for a jury to apportion relative fault between two parties, the jury, of necessity, must have *sufficient evidence* of the culpability of each party to make that apportionment." *S.H. ex rel. Robinson v. Bistryski,* 923 P.2d 1376, 1382 (Utah 1996) (emphasis added). "Sufficient evidence" is not pure speculation, but neither does it require the precise, specific evidence the *Huddell–Caiazzo* approach demands. Rather, sufficient evidence in an enhanced-injury case exists where a plaintiff establishes that the product " 'defect is a substantial factor in increasing the plaintiff's harm beyond that which would have resulted from other causes.' " *Egbert I,* 2007 UT 64, ¶ 19, 167 P.3d 1058 (quoting Restatement (Third) of Torts: Products Liability § 16(a) (1998)).

■■ ¶ 38 We recognize that this apportionment may not be precise. But the law in Utah not only favors apportionment, it demands it. This apportionment may of course, in some cases, be a "rough apportionment." *See, e.g., Boryszewski v. Burke,* 380 N.J.Super. 361, 882 A.2d 410, 423 (Ct.App. Div.2005) ("Indeed, an arbitrary apportionment—equally among the various causative elements—may be appropriate where ... the jury would be incapable of making an apportionment."). Also, "the dilemma of the apportionment of indivisible injuries [may be] nonexistent when viewed from a practical perspective. Experts regularly provide such opinions and juries regularly perform similar apportionments in other contexts." Heather Fox Vickles & Michael E. Oldham, *Enhanced Injury Should Not Equal Enhanced Liability,* 36 S. Tex. L.Rev. 417, 450 (1995). Further, because all injuries, as a matter of Utah law, can and must be apportioned, there is no shifting of burden—informal or formal—to a defendant product seller to prove apportionment. The plaintiff bears the burden of proof in an enhanced-injury case.

■ ¶ 39 Finally, because of the nature of an enhanced-injury claim and the abolition of joint and several liability, a defendant product seller cannot become liable for the entire injury merely by virtue of being a codefendant. The defendant product seller is liable only for the enhanced injury as determined by a fact-finder's apportionment under Utah Code section 78B–5–818(3).

■ ¶ 40 Under this rule of apportionment, in any enhanced-injury case, when a plaintiff provides evidence of a defect and evidence that the defect is a factor in enhancing the injury, the trial court shall instruct the jury that it must apportion fault between the defendant original tortfeasor and the defendant product seller.[16] Given this articulation of the rule in Utah, we answer the

---

16. We acknowledge that this new approach resembles subsection 16(b) of the Restatement. However, unlike subsection 16(b), our approach does not question the ability to apportion because Utah Code section 78B–5–818(3) effectively dictates that all injuries are divisible.

second certified question in the negative: Utah does not follow section 16(b)-(d) of the Restatement (Third) of Torts: Products Liability.

## CONCLUSION

¶ 41 We hold that Utah Code section 78–15–6(3) is constitutional, and that Utah does not adopt subsections 16(b)-(d) of the Restatement (Third) of Torts: Products Liability.

¶ 42 Associate Chief Justice DURRANT, Justice WILKINS, Justice PARRISH, and Justice NEHRING concur in Chief Justice DURHAM'S opinion.